Linda **GERKEN**, Sheila Holt, Nancy Lynn, Trudy Blood, Galen Blood, Emma Lou Swopes, Brenda Gardner, and Missouri Council of the Blind, Appellants,

v.

Gary **SHERMAN**, and Missouri Family Support Division, Respondents.

No. WD 69053.

Missouri Court of Appeals, Western District.

Jan. 13, 2009.

---

Deborah S. Greider, St. Louis, MO, for appellant.

Mark E. Long, Attorney General Office, Jefferson City, MO, for respondent.

PAUL M. SPINDEN, Judge.

Since 1875, the Missouri Constitution has required the General Assembly to levy an annual property tax to fund the blind pension fund. From this fund, the State is to pay pensions to "the deserving blind" as provided by statute. Mo. CONST. art. III, § 38(b) (1945) (originally art. VI, § 47). At dispute in this case is who belongs to the class of "the deserving blind."

The appellants are the Missouri Council of the Blind and blind persons who receive pensions from the fund. They contend that the director of the Department of Social Services[1] and the Family Support

---

**1.** Gary Sherman was director of the department when the appellants filed suit. Deborah Scott is the current director.

Divisi n[2] have improperly asked the General Assembly to use fund resources to pay for pension programs other than the one program for which the fund was intended and had calculated increases in the blind pension illegally for at least the past decade. They asked the circuit court for a judgment declaring that this was the case and for an accounting of the blind pension fund. The circuit court found that division was not requesting that the General Assembly improperly use resources from the fund and was calculating its requested blind pension increases lawfully. The circuit court further found that an accounting was not necessary. We affirm the circuit court's judgment in part and reverse and remand in part.

Article III, § 38(b), of Missouri's constitution says that the General Assembly shall levy an annual tax on all taxable property in the state "for the purpose of providing a fund to be appropriated and used for the pensioning of the deserving blind as provided by law." After payment of the pensions, the provision mandates that any balance remaining in the blind pension fund "may be appropriated for the adequate support of the commission for the blind,[3] and any remaining balance shall be transferred to the distributive public school fund."

The General Assembly endeavored to implement this constitutional mandate in § 209.130, RSMo 2000, by levying an annual tax of three cents on each $100 valuation of taxable property in Missouri to create a fund to pay pensions "for the deserving blind." Like the constitutional provision, § 209.130 also says that any remaining balance in the fund after the payment of the pensions "may be appropriated for the adequate support of the commission for

the blind, and any balance remaining at the end of the biennium shall be transferred to the distributive public school fund." The General Assembly funded the first pensions from the blind pension fund in 1922.

After creating the Blind Pension Program, the State initiated other benefits for blind persons. In 1951, the General Assembly passed the Aid to the Blind Law, which created the Aid to the Blind Program. Sections 209.210–209.350, RSMo Cum. Supp. 1951. This program's purpose was to match federal funds and to grant benefits to persons who met requirements beyond those for the Blind Pension Program. Its recipients received a monthly pension equal to the blind pension. State and federal funds financed the Aid to the Blind pensions, but the General Assembly specifically designated that the funds for the State's portion was to come from the blind pension fund. Section 209.290. In § 209.220.3, the General Assembly declared its intention to fund both Blind Pensions and Aid to the Blind and "that the words 'pensioning of the deserving blind' as used in any law of this state shall be construed to include aid to the blind."

When Congress created the Supplemental Security Income (SSI) program in 1972, it replaced federal legislation that created the Aid to the Blind program. SSI adversely affected some people who qualified for Aid to the Blind pensions because of SSI's different qualification requirements and benefit payments. To rectify this problem, Congress authorized state governments to create programs, beginning on January 1, 1974, to aid individuals who would be adversely affected by SSI.

Acting on this authority, the General Assembly repealed Missouri's Aid to the

---

2. We refer to the director and the Family Support Division collectively as the division.

3. The commission has been reorganized as the Rehabilitation Services for the Blind.

Blind Law in 1973 and enacted legislation enabling persons eligible for Aid to the Blind pensions on December 31, 1973, to continue to receive the same benefit after January 1, 1974. Section 208.030, RSMo Cum. Supp. 1973. The law provides that, if recipients of Aid to the Blind pensions receive SSI benefits that are less than their Aid to the Blind pension on December 31, 1973, the State will supplement SSI benefits so that they are equal to the Blind Pension. Section 208.030.2, RSMo 2000. State officials dubbed this program "Aid to the Blind, Conversion" or "AB Conversion."

At the same time, the General Assembly created the "Supplemental Aid to the Blind" or "SAB" program. SAB allows those persons who would have met the requirements for participating in Aid to the Blind on or after January 1, 1974, to receive the same pension as those who were eligible for the Aid to the Blind pension on December 31, 1973. Section 208.030.4, RSMo 2000. The State guarantees that it will pay SAB recipients the same as the Blind Pension less any SSI benefits.

The General Assembly enacted appropriation legislation in 1973 to fund these programs from the blind pension fund. C.C.S.H.B. 6, 77th Gen. Assem., 1st Reg. Sess. (Mo. 1973). The General Assembly has funded these programs from the blind pension fund every year since then.

Another State program for blind people is Rehabilitation Services for the Blind, formerly known as the Commission for the Blind. The State established this program to promote employment and training of blind persons and to aid in efforts to prevent blindness. 13 CSR 40.91–010, *et seq.* The federal government provides 80 percent of Rehabilitation Services' funding. The remaining 20 percent comes from the blind pension fund.

More than 2800 persons participate in the Blind Pension program. Less than 50 persons participate in the AB Conversion program. SAB has approximately 700 participants, and Rehabilitation Services provides services for 10,000 to 12,000 persons. The division manages all of these programs.

The division also is responsible for administering the blind pension fund. Section 207.010, RSMo 2000. Each year, the Department of Social Services, of which the division is a part, prepares a budget request pursuant to the State's budget process, including a request for funds for the blind pension fund. The department submits its budget request to the Office of Administration, which works with the Governor's staff to develop the Governor's recommended budget. The Governor's recommended budget can alter the department's request. The General Assembly then enacts a budget, subject to the Governor's approval, to provide for appropriations to be made. Appropriations are the General Assembly's authorizations to spend designated amounts from designated funds for particular purposes. Pursuant to the General Assembly's appropriations, the division expends funds to finance the Blind Pension pensions, AB Conversion pensions, SAB pensions, and Rehabilitation Services.

In their first point, the appellants complain that the circuit court erred in finding that the division's requesting to use funds from the blind pension fund to finance AB Conversion and SAB pensions was not contrary to Article III, § 38(b), and § 209.130. Interpretation of a constitutional or statutory provision is a question of law and is subject to our *de novo* review. *Akers v. City of Oak Grove,* 246 S.W.3d 916, 919 (Mo. banc 2008); *City of Springfield v. Sprint Spectrum, L.P.,* 203 S.W.3d

177, 182 (Mo. banc 2006). Generally, we subject constitutional provisions to the same rules of construction as other laws, except that we construe them more broadly "due to their more permanent character." *Neske v. City of St. Louis*, 218 S.W.3d 417, 421 (Mo. banc 2007). When interpreting a statute, our task is to ascertain the General Assembly's intent according to plain and ordinary meaning of the statute's language. *Cline v. Teasdale*, 142 S.W.3d 215, 222 (Mo.App.2004).

Article III, § 38(b), says that the blind pension fund is to be "appropriated and used for the pensioning of the deserving blind as provided by law." Section 209.130 says that pensions are to be paid with funds from the blind pension fund "for the deserving blind as herein provided." It adds that pensions should be paid "as provided by law."

A pension is "a fixed sum paid regularly to a person." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1671 (1993). The three cash assistance programs funded by the blind pension fund—Blind Pension, AB Conversion, and SAB—pay a monthly sum to eligible recipients and are, therefore, pensions. Likewise, all three have the same statutory blindness requirements, but have different eligibility requirements based on age, income, assets, and behavior. *See* §§ 209.030, 209.040, and § 208.030. The appellants based their contention that only Blind Pension recipients constitute "the deserving blind" on these different eligibility requirements.

Neither the constitutional provision nor statutes define "the deserving blind." Precisely who constitute the "deserving blind" is not readily apparent. That the General Assembly would not define it significantly thwarts our efforts to give operation to the legislature's intent. We are left to divine whom the General Assembly intended to include in the class of the "deserving blind."

The appellants contend that the class should be restricted to those individuals who satisfy the eligibility requirements set out in Chapter 209 of the Revised Statutes. They base this argument on § 209.130's phrase "the deserving blind as herein provided," contending that "herein provided" restricts the "deserving blind" to those persons described in Chapter 209. The statutes of Chapter 209 set forth the eligibility requirements for the Blind Pension recipients. Chapter 208 contains the eligibility requirements for AB Conversion and SAB participants.

To determine whether or not the General Assembly intended to exclude AB Conversion and SAB participants from the "deserving blind," we may consider the history of § 209.130, its surrounding circumstances, and its objectives. *See Anderson ex rel. Anderson v. Ken Kauffman & Sons Excavating, L.L.C.*, 248 S.W.3d 101, 109 (Mo.App.2008). When the legislature enacted § 209.130 and thereby created the blind pension fund, the only cash assistance program for blind persons in Missouri was the Blind Pension program; hence, the only members of the "deserving blind" class at that time were Blind Pension recipients. The legislature did not create the Aid to the Blind program, the predecessor to the AB Conversion and SAB programs, until 1951, long after the enactment of Article III, § 38(b), and § 209.130 and approximately 30 years after the General Assembly first funded Blind Pensions. When the legislature created Aid to the Blind, it declared that its participants were "the deserving blind" and that their pensions, like Blind Pensions, would be funded from the blind pension fund.

The appellants stress that, when the General Assembly repealed the Aid to the Blind Law in 1973 and replaced it with legislation creating the AB Conversion and SAB programs, it did not say anything about including AB Conversion and SAB participants in "the deserving blind" or instruct that the State's portion of these programs be funded from the blind pension fund, as it had in the Aid to the Blind Law. The reason, however, that the General Assembly created the AB Conversion and SAB programs was to continue providing pensions to those blind persons who either were participating in the Aid to the Blind Program or would have been able to participate in the Aid to the Blind program had Congress not repealed the federal Aid to the Blind Law. Thus, the purpose for the General Assembly's creating the AB Conversion and SAB programs was to protect the pension benefits of those whom it considered to be included in the "deserving blind" under the State's Aid to the Blind Law. Moreover, as it did with the Aid to the Blind pensions, the General Assembly funded the State's portion of AB Conversion and SAB pensions from the blind pension fund. The history of § 209.130 indicates that the General Assembly considers the AB Conversion and SAB participants to be the "deserving blind."

Nevertheless, the appellants contend that AB Conversion and SAB participants who receive SSI are specifically precluded from receiving any pension paid out of the blind pension fund. They base their argument on § 209.040.1, which says:

> Every person passing the vision test and having the other qualifications provided in sections 209.010 to 209.160 shall be entitled to receive a monthly pension in an amount established by appropriations made by the general assembly for that purpose but not less than three hundred forty dollars; *except that pensions to the blind as provided herein shall not be payable to a blind person unless such person has been declared ineligible to receive aid under the federal supplemental security income program,* nor shall pensions to the blind as provided herein be payable to any person who is receiving general relief assistance.[4]

The italicized clause does not preclude paying any pension financed by the blind pension fund to SSI recipients. It merely declares that those persons who receive SSI cannot also receive a Blind Pension payment.

This interpretation of § 209.040.1 is reinforced by the General Assembly's language in § 208.030, the statute concerning AB Conversion and SAB pension benefits. Although the General Assembly sets out the programs' benefits in different chapters of the Revised Statutes, we still can consider statutes relating to the same subject matter *in pari materia.* In other words, we must " 'interpret and apply statutory provisions with reference to each other to determine legislative intent.' " *Preston v. State,* 33 S.W.3d 574, 579 (Mo. App.2000) (citation omitted). Section 208.030.2 provides that the AB Conversion pension benefit "shall be in an amount which, when added to the federal supplemental security income payment, equals the amount of the blind pension grant as provided for in chapter 209, RSMo." If a person does not receive SSI, the AB Conversion pension benefit is to be "a blind pension payment as prescribed in chapter 209." Section 208.030.3. Likewise, § 208.030.4 provides that the SAB pension benefit "shall be in the amount prescribed in subsection 1 of section 209.040, RSMo, less any federal supplemental security income payment."

4. We added the emphasis.

The legislature has structured AB Conversion and SAB pensions so that participants in these programs receive the same monthly pension amount as Blind Pension participants. If AB Conversion and SAB participants receive SSI benefits, the State's portion of the pension payment is reduced by the amount of the SSI that they receive. This prevents AB Conversion and SAB pensioners from receiving SSI and the full amount of a Blind Pension. Understood in this manner, it is consistent with § 209.040.1's directive that persons who receive SSI cannot receive a Blind Pension payment from the blind pension fund.

The constitution's broad language that the blind pension fund is to be "used for the pensioning of the deserving blind as provided by law" does not limit the General Assembly to one pension program. The General Assembly has created three pension programs for the blind and has determined that participants in each shall receive the same amount each month. If AB Conversion and SAB participants receive SSI, the State's portion of their pensions is reduced by the amount of SSI received. The General Assembly has appropriated the funding for all three programs from the blind pension fund since their inception. The General Assembly obviously intends that AB Conversion and SAB participants be included in the "deserving blind"; therefore, the division's request to finance the pensions from the blind pension fund was not contrary to Article III, § 38(b), or § 209.130.

In their second point, the appellants claim that the circuit court erred in finding that the division was calculating its requested annual increases to Blind Pensions correctly. Before 1986, the General Assembly had not mandated a formula for calculating an increase to Blind Pensions, and the General Assembly determined each year the amount of any annual increase. In 1986, the General Assembly amended § 209.040.4 to set out a formula for calculating annual increases to blind pensions:

> The monthly pension provided in subsection 1 of this section shall be increased by the general assembly by an appropriation bill by a monthly pension amount which equals one-twelfth of the quotient obtained by dividing seventy-five percent of the annual growth of funds in the blind pension fund for the preceding fiscal year by the number of persons eligible to receive the monthly pension provided in subsection 1 of this section.[5]

During 1992, the General Assembly amended § 209.040.1 to establish a minimum monthly amount of $340 for Blind Pensions. From Fiscal Year 1995 through Fiscal Year 1998, the monthly Blind Pension grant was $373. In FY 1999, the amount increased to $383 and has increased every year since then. The appellants contend, however, that the pensions should have increased before FY 1999 and that the division incorrectly calculated the increases after FY 1999.

The appellants argue that the division's miscalculation resulted from its misinterpretation of § 209.040.4's phrase, "annual growth of funds in the blind pension fund."

---

**5.** Conversely, the statute also provides for a decrease in the pension amounts should revenue decrease. Section 209.040.2 says, "If the funds at the disposal of or which may be obtained by the department of social services for the payment of benefits under this section shall at any time become insufficient to pay the full amount of benefits to each person entitled thereto, the amount of benefits of each one of such persons shall be reduced pro rata in proportion to such deficiency in the total amount available or to become available for such purpose."

From 1992 through 2004, the division calculated the annual growth of funds by taking the beginning balance from the current fiscal year, adding projected revenues that the fund would receive in the current year, and subtracting all of the fund's projected expenses for the current year. The result was a projected ending balance for the current fiscal year. The difference between the projected ending balance for the current fiscal year and the actual ending balance for the prior fiscal year yielded the change in the fund's balance, which the division considered to be the annual growth of funds.

During 2004, the Missouri Council of the Blind requested that the division interpret "annual growth of funds" to be the growth in the fund's revenue instead of the growth in the fund's balance. In determining the growth in the fund's revenue, the council proposed that the division examine several years of data to project revenues for the coming year and subtract the previous year's revenues from the projection to obtain a projection for the growth of funds. The growth in revenues method would result in a greater increase to the Blind Pensions because it would not subtract expenses.

The division agreed to use the council's proposed calculation beginning with FY 2005. Because the General Assembly had already appropriated the amount of the blind pension increase for FY 2005 based on the growth in the fund's balance, the division requested a supplemental appropriation by the legislature to retroactively implement for FY 2005 the increase based on the growth in the fund's revenue. The General Assembly granted the request.

The appellants asked the circuit court to declare that the division's method of calculating Blind Pension increases based on the growth in the fund's balance was illegal. The circuit court found that, because the legislature had not defined "annual growth of funds," basing increases in Blind Pensions on either the growth in fund's balance, as the division did from FY 1992 to FY 2004, or the growth in the fund's revenue, as the division did beginning in FY 2005, was permissible under § 209.040.4.

The circuit court erred. Basing pension increases on the growth in the fund's balance is inconsistent with Article III, § 38(b), and § 209.130. These provisions call for transfer of any balance remaining in the fund at the end of each biennium to the distributive public school fund. To base the pension increase on a balance that the constitution and statute provide to be swept to zero every two years is illogical. Moreover, subtracting anticipated expenses for Rehabilitation Services before calculating pension increases is also contrary to the preferences articulated in Article III, § 38(b), and § 209.130. These provisions provide for payment of pensions first. Then, "[a]ny balance remaining in the fund after the payment of the pensions may be appropriated" for Rehabilitation Services. Instead of treating the appropriation to Rehabilitation Services as permissive, as the constitution and statute require, the division treated it as mandatory to the detriment of the pensioners.

We interpret statutes in a manner that is consistent with reason. *David Ranken, Jr., Technical Institute v. Boykins,* 816 S.W.2d 189, 192 (Mo. banc 1991), *overruled on other grounds, Alumax Foils, Inc. v. City of St. Louis,* 939 S.W.2d 907 (Mo. banc 1997) ("law favors statutory construction that harmonizes with reason"). Doing so makes clear that "annual growth in funds in the blind pension fund" means the growth of revenue going into the fund— not growth in the fund's balance.

In their third point, the appellants complain that the circuit court erred in permit-

ting the division to accumulate a "large and growing balance" in the fund at the end of each fiscal year. The appellants contend that, at the end of FY 2006, a balance of $13 million was in the fund and was "doing nothing for anyone." Although the appellants appear to be asserting that any unspent balance should be divided among the Blind Pension recipients, Article III, § 38(b), and § 209.130 specifically provide that any balance remaining in the fund at the end of each biennium "shall be transferred to the distributive public school fund." The appellants complain that the Treasurer has not swept the blind pension fund to the distributive public school fund since 1991.

■ We do not understand why the appellants have standing to pursue a declaratory judgment action against the division for not sweeping the fund into the distributive public school fund. "[T]o have standing in a declaratory judgment action, the [party] must have a legally protectable interest at stake." *Blue Cross and Blue Shield of Missouri v. Nixon*, 81 S.W.3d 546, 551 (Mo.App.2002). "A legally protectable interest means a pecuniary or personal interest directly in issue or jeopardy which is subject to some consequential relief, either immediate or prospective." *Id.* at 552 (internal quotations and citations omitted). The public schools—not the appellants—have a pecuniary or personal interest directly jeopardized by the State's failure to sweep the blind pension fund balance into the distributive public school fund. The Treasurer's decision not to sweep the fund's balance has no impact on the amount of benefits the appellants receive from the blind pension fund.[6] The appellants lack standing to ask for a judgment declaring that the Treasurer should have swept the blind pension fund's balance.

■ In their fourth point, the appellants allege that the circuit court erred by not requiring the division to promulgate a rule setting forth its method for calculating its requested annual increases to Blind Pensions. This point is moot. Our determination in this case that the correct method under the statute is to calculate requested increases based on the growth in the fund's revenue makes the calculation a matter of law.

In their fifth point, the appellants allege that the circuit court erred by waiting until after trial of the case before certifying the requested class and treating this case as a *bona fide* class action lawsuit. The appellants requested class certification in their petition and moved for certification of the class before trial. The circuit court declined to rule on the certification motion until four months after the trial and two months before it entered judgment. Although the circuit court granted the appellants' motion and certified the class, the appellants claim that the circuit court's waiting to do so until after trial was erroneous and requires reversal.

Rule 52.08(c)(1) requires the circuit court to determine whether or not to certify a class for a class action "[a]s soon as

6. Indeed, the only potential impact the failure to sweep has on the appellants is positive rather than negative because keeping a balance in the fund assures that it remains solvent and that pensions will be distributed during the six months before property tax revenue flows into the fund. Although the appellants argue that the department does not need a balance in the fund at the end of each fiscal year because it simply can request a loan from the budget reserve fund to cover any shortfall, there is no guarantee that a loan will be given. Moreover, the appellants recognize that the blind pension fund would have to pay back any loan with interest. We fail to see how this would be beneficial to Blind Pension recipients.

practicable after the commencement" of the lawsuit. The appellants contend that, by waiting until trial to certify the class, the circuit court was conducting an inquiry into whether or not they had stated a cause of action or ought to prevail on the merits. This is improper, as the only consideration in determining the propriety of a class action is whether or not the plaintiffs have satisfied the requirements of Rule 52.08. *Meyer ex rel. Coplin v. Fluor Corporation,* 220 S.W.3d 712, 715 (Mo. banc 2007) (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)).

The record does not indicate why the circuit court waited until after trial to certify the class. Nevertheless, even if the circuit court's delay were erroneous, the appellants would not be entitled to relief because they have not demonstrated any prejudice.

■ The appellants attempt to show prejudice by claiming that the circuit court's sending notice to class members after presentation of evidence did not allow potential class members "a meaningful opportunity to obtain counsel, provide testimony, or in any other manner protect individual interests." In their petition and in their certification motion, however, the appellants alleged that they were "adequate representatives" of the proposed class, that their interests did not conflict with the interests of the class, that they would "fairly and adequately protect the interests of the class," and that they were "represented by counsel skilled in class action and public benefits litigation who [would] fairly and adequately represent" the class.

The appellants also appear to argue that the circuit court's notice was deficient be-cause it allowed class members only slightly more than 30 days to opt out. On August 6, 2007, however, the appellants and the division *jointly* submitted a proposed notice of class certification with the opt-out deadline of September 10, 2007.[7]

The appellants further assert that a class member may be able to file a suit challenging the adequacy of the certification process and obtain a new hearing on the same issues. Although we understand how this possibility might prejudice the division by necessitating its defending against these claims a second time, we do not discern how this prejudices the appellants.

■ In their sixth point, the appellants assert that the circuit court erred by holding that, even if it were to find in their favor "on some issue," the three-year statute of limitations in § 516.130(1), RSMo Cum. Supp. 2007, limited their recovery. Whether or not a statute of limitations applies is a question of law which we review *de novo. Branstad v. Kinstler,* 166 S.W.3d 134, 135 (Mo.App.2005).

Section 516.130 says, "An action against a sheriff, coroner or other officer, upon a liability incurred by the doing of an act in his official capacity and in virtue of his office, or by the omission of an official duty, including the nonpayment of money collected upon an execution or otherwise[ ]" shall be brought within three years. The director contends that this statute of limitations applies because he is a state officer.

■ The appellants did name the director, in his official capacity, as a defendant. Nevertheless, the "gravamen or a fair reading of the complaint in its totality" is what determines the applicable statute

---

**7.** The appellants argue that the court did not approve the parties' proposed class certification notice until August 27, 2007. The record, however, indicates that the court approved it on August 6, 2007, the same day that the parties submitted it.

of limitations. *Cox v. Ripley County,* 233 S.W.3d 225, 230 (Mo.App.2007) (internal quotations and citations omitted).

The appellants alleged that "the State" had been unlawfully administering the blind pension fund in several respects. The state agency charged with administering the fund is the division. Although the appellants named Gary Sherman as a defendant because he was director of the Department of Social Services when they filed their petition, the appellants do not allege that the liability for which they sought redress was incurred by any act or omission within Sherman's official capacity. Rather, their complaint concerned actions taken by the division.

This court's Southern District said in *Cox* that "the three-year period of Section 516.130.1 more appropriately applies when only one official is involved and the cause of action is based on an alleged wrong that occurred as part of that officer's official conduct." *Id.* at 229. In this case, as in *Cox,* "there is no allegation that the matter complained of was committed by any particular individual." *Id.* The circuit court erred in finding that the three-year statute of limitations period of § 516.130 applied to the appellants' claims.

In their seventh point, the appellants contend that the circuit court erred by denying its request for an equitable accounting. The appellants prayed for an accounting of "all monies expended by the State from the Blind Pension Fund." They claimed that an accounting was "necessary to show the amounts the State wrongfully diverted, withdrew, withheld, segregated, saved, and/or expended from the Blind Pension Fund, the amounts wrongfully withheld by the State and remaining in the Blind Pension Fund wherever held, and the amounts due the [appellants]." The appellants renewed their request for an accounting in their pre-trial brief. The circuit court denied the appellants' request.

An accounting action is tried in two phases. *Fleahman v. Fleahman,* 25 S.W.3d 162, 164 (Mo.App.1999). In the first, the circuit court determines whether or not the requesting party has the right to an accounting: when the party shows a need for discovery, complicated accounts, a fiduciary or trust relationship between the parties, and lack of an adequate legal remedy. *Cook v. Martin,* 71 S.W.3d 677, 679 (Mo.App.2002). If the circuit court finds that the requesting party has a right to an accounting, it should enter an interlocutory order to that effect. *Fleahman,* 25 S.W.3d at 164. The second phase is the actual accounting. *Id.* Whether or not a party is entitled to an accounting is a matter within the circuit court's discretion, and we will not disturb its decision in the absence of a showing of an abuse of discretion. *Ballesteros v. Johnson,* 812 S.W.2d 217, 220 (Mo.App.1991).

The circuit court denied the appellants' request for an accounting because it found that the division had been calculating requested pension increases properly. Because this conclusion was erroneous, we reverse and remand so the circuit court can reconsider the appellants' request for an accounting. On remand, the circuit court should determine whether or not the appellants proved the requisite elements for an accounting. If it concludes that they did, it shall order an accounting.

In their eighth point, the appellants contend that the circuit court erred by denying their request to admit into evidence two letters that a department official, Steven E. Renne, wrote in the early 1990s concerning how to calculate requested Blind Pension increases. The appellants argue that the letters were relevant to show that the department approved use of

the growth in revenue method to calculate requested Blind Pension increases. In light of our disposition of this case, the point is moot.

We reverse those portions of the circuit court's judgment in which it upheld the division's calculation of requests for Blind Pension increases based upon the growth in the blind pension fund's balance; in which it held that § 516.130's three-year statute of limitations applied to the appellants' claims; and in which it held that the appellants were not entitled to an accounting. We remand the case to the circuit court so it can reissue a judgment in accord with this opinion concerning those issues. In other respects, we affirm the circuit court's judgment.

HAROLD L. LOWENSTEIN, Presiding Judge, and VICTOR C. HOWARD, Judge, concur.