COMMITTEE FOR EDUCATIONAL
EQUALITY, et al., Appellants,

Coalition to Fund Excellent Schools,
et al., Appellants,

v.

STATE of Missouri, et
al., Respondents,

W. Bevis Schock, Rex Sinquefield, and
Menlo Smith, Respondents.

No. SC 89010.

Supreme Court of Missouri,
En Banc.

Sept. 1, 2009.

Alex Bartlett, Husch Blackwell Sanders, LLP, Audrey Hanson McIntosh, Audrey Hanson McIntosh, PC, Jefferson City, MO, James C. Owen, McCarthy, Leonard & Kaemmerer, L.C., Chesterfield, MO, Richard B. Walsh, Jr., Evan Z. Reid, Lewis, Rice & Fingersh, L.C., St. Louis, MO, for Appellants.

Chris Koster, Attorney General, James R. Layton, State Solicitor, Jefferson City, MO, Christopher J. Quinn, Assistant Attorney General, Maureen Beekley, Assistant Attorney General, Joshua M. Schindler, The Schindler Law Firm, John R. Munich, St. Louis, MO, for Respondents.

Ellen M. Boylan, Newark, New Jersey, for Amici Curiae.

Rodney D. Gray, Jefferson City, MO, for Citizens for Missouri's Children and Missouri Child Care Resource and Referral Network.

Molly A. Hunter, Educational Law Center, Newark, New Jersey, Melissa K. Randol, Columbia, MO, for Missouri School Boards Association, et al.

MARY R. RUSSELL, Judge.

The issue before this Court is the constitutional validity of Missouri's system for funding public schools. Plaintiffs [1] allege that Missouri's school funding formula results in a public education system that is unconstitutionally disparate and inadequate. They assert that the formula applies wrongly calculated tax assessment data, rendering incorrect "local effort" contributions and directly impacting the adequacy and equity of the education provided in Missouri's schools. The State of Missouri defends the school funding formula, arguing that it is constitutional and that it incorporates appropriate tax assessment data.[2]

After extensive discovery and a trial lasting more than a month,[3] the trial court found against Plaintiffs, denying some claims on their merits and dismissing others. This appeal follows.

Exclusive jurisdiction of Plaintiffs' appeal is in this Court pursuant to Missouri

---

1. All plaintiffs in this case, including plaintiff-intervenors, are referred to collectively in this opinion as Plaintiffs. Plaintiffs include two not-for-profit education advocacy groups, the Committee for Educational Equality (CEE) and the Coalition to Fund Excellent Schools (CFES), which each represent member school districts. CEE, together with certain school districts, students, parents, and taxpayers, raised constitutional challenges to Missouri's school funding formula. CFES, together with the Board of Education of the City of St. Louis, certain school districts, students, parents, and taxpayers, intervened in CEE's constitutional claims and raised a separate challenge to the tax assessment calculations underlying the funding formula. Plaintiffs include 271 of Missouri's 524 school districts.

2. The defendants in this case include the State of Missouri, the State Treasurer, the State Board of Education, the Department of Elementary and Secondary Education, the Missouri Commissioner of Education, the Commissioner of Administration, and Missouri's Attorney General. These defendants are referred to collectively in this opinion as Defendants.

3. This case includes a 36–volume legal file (6,418 pages), a 34–volume trial transcript (8,552 pages), and various transcripts of related proceedings.

Constitution article V, section 3, as the case presents a challenge to the constitutional validity of a Missouri statute.

This Court agrees with the trial court that Plaintiffs have not shown they are entitled to relief and affirms its judgment.[4]

## I. Background

Plaintiffs originally brought suit to challenge Missouri's school funding formula as it existed in 2004, referred to generally as Senate Bill No. 380 (1993) (SB380). They alleged that Missouri's school funding formula was unconstitutional because it resulted in inadequate and inequitable funding to Missouri's public schools. They maintained that the inadequacies of that school funding formula undermined article IX, section 1(a), of the Missouri Constitution, which directs that the State provide all persons under 21 years of age a free public education to promote "[a] general diffusion of knowledge and intelligence."[5]

As Plaintiffs' case proceeded, the legislature amended the school funding formula in 2005. As such, this case has evolved into a challenge of Missouri's current school funding formula, adopted in Senate Bill No. 287 (2005) (SB287).[6]

SB287's revisions to the school funding formula were made after a joint legislative committee, the Joint Interim Committee on Education, investigated concerns that Missouri's school funding scheme was inadequate and inequitable. This investigation led to the passage of SB287 during the 2005 legislative session. SB287's funding formula is codified in chapter 163, RSMo Supp.2008.[7]

In simplified form, this formula provides state aid to Missouri's public schools under the following calculation:

$$\begin{array}{l} \text{[weighted average daily attendance}^{8}] \\ \times \quad \text{[state adequacy target}^{9}] \\ \times \quad \text{[dollar value modifier}^{10}] \\ = \quad \text{subtotal of dollars needed} \end{array}$$

4. The trial court found that CFES plaintiffs did not have standing to challenge the tax assessment calculations incorporated into the school funding formula because they could not challenge the assessments of others and had failed to join the State Tax Commission as a necessary party. CFES plaintiffs do not pursue this assessment issue in this appeal. CFES plaintiffs raised a second assessment-related claim, arguing that the legislature arbitrarily relied on 2004 tax assessments from the State Tax Commission. The trial court made no findings as to CFES plaintiffs' standing as to this second claim, which is addressed in this opinion.

5. Plaintiffs have provided a thorough history of Missouri's constitutional provisions for public education. Missouri's role in providing its citizens a public education was outlined in its territorial charter in 1812, which stated: "[K]nowledge, being necessary to good government and the happiness of mankind, schools and the means of public education shall be encouraged and provided for[.]" Territorial Laws of Missouri, vol. I, ch. IV, sec. 14 (page 13) (approved June 4, 1812).

6. SB287 as truly agreed to and finally passed by the legislature and signed by the governor incorporated a number of modifications and amendments from the bill as originally filed, but these modifications are not relevant here. By its terms, SB287 became effective July 1, 2006.

7. All statutory references in this opinion are to RSMo Supp. 2008, unless otherwise indicated.

8. This figure accounts for the average number of students and also accounts for student needs.

9. This number is a per-pupil spending target that is defined and calculated according to section 163.011(18). Its calculation includes certain "current operation expenditures" defined in section 163.011(3). For 2007 and 2008, the state adequacy target was set at $6,117.

10. This number adjusts for variations in costs across the state.

  - [local effort [11]]
  = state funding

The revised formula attempted to remedy inequities resulting from school funding that is financed in part by state funds and in part by local funds. It reflected a view that schools with greater "local effort" contributions require less state financial assistance to meet the costs of providing a free public education.

SB287's formula was designed to be phased in over seven years, with the old formula under SB380 still accounting for a large portion of the calculated state aid at the outset.[12] Both the SB380 and SB287 formulas applied assessed valuation calculations about which the Plaintiffs complain in this case. Plaintiffs' assessment complaints and constitutional arguments are similar in that they both allege that Missouri's school funding formula fails to fund its public schools adequately.

At trial, Plaintiffs presented evidence of alleged inadequacy through "focus district" plaintiff schools, whose funding under SB287's formula failed to meet the required "state adequacy target." Plaintiffs stressed that the alleged inadequacy of school funding in Missouri most impacts Missouri's high-risk children, such as those living in poverty and those with special needs. They also highlighted the spending disparities among Missouri's school districts, with per-pupil spending ranging from $4,704.11 in the Diamond R–IV School District to $15,251.28 in the Gorin R–III School District. And they noted the differences among the tax bases in Missouri's school districts, with assessed valuation per eligible pupil in the 2004–2005 school year ranging from $19,605 in the Cooter R–IV School District to $416,679 in the Clayton School District.

Plaintiffs argued the assessed valuation calculations incorporated into SB287's funding formula were inaccurate. They contended that the legislature acted irrationally in relying on 2004 tax assessment data that they assert were calculated unlawfully by the State Tax Commission through a failure of its oversight and equalization responsibilities. They argued that Missouri's assessed valuations were not on pace with market values and suggested that the legislature compounded this mistake by "freezing" the 2004 assessment data into the funding formula. Their evidence included a study critical of Missouri's school funding formula that was conducted at the Public Policy Research Center (PPRC) at the University of Missouri–St. Louis. This study, "Disparity of Assessment Results: Why Missouri's School Funding Formula Doesn't Add Up" (hereinafter PPRC Study), was reported in October 2006. The PPRC Study concluded that SB287's funding formula was based wrongly on assessment calculations that varied widely throughout the state and that, in many cases, were unacceptably low because they did not reflect market values.

An education finance expert testified on Plaintiffs' behalf that Missouri's school finance system was "one of the most disparate systems in existence in the United States" because SB287's funding formula placed a greater financial burden on local school districts by increasing their responsibility for funding public schools. Plaintiffs acknowledged that SB287's formula revisions would contribute more than $2 million in additional funds for Missouri's schools but noted that the increased monies were far below the additional $904.8 million in funds that Missouri's State

---

11. "Local effort" is calculated according to section 163.011(10).

12. Section 163.031.4 provides phase-in calculations applying both the SB380 and SB287 formulas through the 2011–2012 school year.

Board of Education had determined were necessary to fund Missouri's public schools adequately.

Defendants countered Plaintiffs' evidence by stressing that SB287 would provide an additional $800 million for Missouri's public education system when fully phased in. They stressed that the long-term goal of SB287 was to move Missouri's funding formula to a need-based, rather than a tax-based, system to provide increased state aid to poorer school districts. They also asserted that the funding produced under the SB287 formula is constitutional because it complies with the funding mandate outlined in article IX, section 3(b), of the Missouri Constitution, which provides that the State "set apart [no] less than [25] percent of the state revenue, exclusive of interest and sinking fund, to be applied annually to the support of the free public schools." [13]

The trial court agreed with Defendants that the State is not required to provide its public schools funding beyond 25 percent of the State's revenue, as directed by article IX, section 3(b). It noted that the legislature *may* provide additional monies, but it determined that no Missouri constitutional provision *requires* allocation of increased funding. The trial court also found that Plaintiffs had not shown that SB287 violated the Missouri Constitution's Hancock Amendment or that it provided the remedy sought. The trial court dismissed the assessment calculation issues on standing and jurisdictional grounds, and it rejected Plaintiffs' claims that the legislature wrongly relied on the State Tax Commission's 2004 assessment data.

Plaintiffs appeal the trial court's judgment, raising four categories of challenges to Missouri's school funding formula: (1)

**13.** Plaintiffs did not challenge that the State failed to meet the 25–percent requirement in

the formula "inadequately" funds schools in violation of article IX of the Missouri Constitution; (2) the formula violates equal protection; (3) the formula violates Missouri's Hancock Amendment; and (4) the legislature violated article X of the Missouri Constitution and certain statutes by incorporating inaccurate assessment figures into the formula. These issues are addressed separately below.

## II. Procedural Issues

Before addressing Plaintiffs' challenges to the school funding formula, this Court addresses two threshold issues: (1) Plaintiffs' standing; and (2) the joining of defendant-intervenors.

### A. Standing

■ This Court must address issues of standing before exploring Plaintiffs' constitutional challenges. *See, e.g., Conseco Fin. Servicing Corp. v. Mo. Dep't of Revenue*, 195 S.W.3d 410, 413 n. 3 (Mo. banc 2006). Standing is reviewed *de novo. Mo. State Med. Ass'n v. State*, 256 S.W.3d 85, 87 (Mo. banc 2008). Standing requires that a party seeking relief has some legally protectable interest in the litigation so as to be affected directly and adversely by its outcome, "even if that interest is attenuated, slight or remote." *Id.*

Defendants challenge Plaintiffs' standing on several grounds, which are detailed below.

### 1. School District Organizations

■ Defendants contend that the plaintiff school districts and their representative not-for-profit advocacy organizations lack standing to litigate constitutional claims concerning individual rights. For

article IX, section 3(b).

an organization to have standing, its members must have standing, the interests it seeks to protect must be germane to the organization's purpose, and the participation of individual members must not be required. *Mo. Health Care Ass'n v. Attorney Gen. of Mo.*, 953 S.W.2d 617, 620 (Mo. banc 1997).

This Court has stated that "the capacity of a school district to sue and its authority to prosecute actions required to protect and preserve school funds and property is necessarily implied from the district's duty to maintain schools and conduct instruction within its boundaries." *State ex rel. Sch. Dist. of Independence v. Jones*, 653 S.W.2d 178, 185 (Mo. banc 1983) (finding that school districts were not barred from bringing a declaratory judgment challenge to the State Tax Commission's future calculations of school funding monies).

■ Arguing that their duties are impaired, Plaintiffs assert that article IX, section 1(a), of the Missouri Constitution, which guarantees free public schools, also contains a requirement for "adequate" funding for those schools. Because they argue that, under their interpretation, school districts would be entitled to more funds, the plaintiff school districts and their representative organizations have standing to challenge the school funding formula under article IX, section 1(a). *See Comm. for Educ. Equal. v. State*, 878 S.W.2d 446, 458 (Mo. banc 1994) (Robertson, J. concurring) (suggesting that school district standing was proper under article IX, section 1(a)); *Gerken v. Sherman*, 276 S.W.3d 844, 853 (Mo.App.2009) (stating that public schools have a legal interest directly jeopardized when the state failed to place certain funds into the public school fund).

■ Similarly, school districts and their representative organizations have standing for their assessment challenges raised under article X, concerning taxation, in that they allege the legislature wrongly relied on inaccurate tax assessment data. They contend this impacts their duty to provide a free public education under article IX, section 1(a) in that an injury results from use of inaccurate assessment data in "local effort" calculations.

■ School districts and their representative organizations lack standing to assert that the alleged inadequacy of school funding violates their equal protection rights or the Hancock Amendment. Political subdivisions established by the State are not "persons" within the protection of the due process and equal protection clauses. *City of Chesterfield v. Dir. of Revenue*, 811 S.W.2d 375, 377 (Mo. banc 1991). Also, the Hancock Amendment by its terms does not grant standing to school districts or their representative organizations. Mo. Const. art. 10, sec. 23 (granting taxpayers standing to sue under the Hancock Amendment).

## 2. Taxpayers

■ Defendants also argue that individual taxpayer plaintiffs lack standing to bring challenges to other taxpayers' property tax assessments, as they are not injured personally by others' assessment calculations. *See W.R. Grace & Co. v. Hughlett*, 729 S.W.2d 203, 206–07 (Mo. banc 1987) (finding that a plaintiff did not have standing to challenge excused tax obligations of others). "The primary basis for taxpayer suits arises from the need to ensure that government officials conform to the law." *E. Mo. Laborers Dist. Council v. St. Louis County*, 781 S.W.2d 43, 46 (Mo. banc 1989).

■ Plaintiff taxpayers have standing to raise their assessment challenges to the extent that they allege that the State is spending tax revenue improperly under

articles IX and X of the Missouri Constitution, which concern expenditures related to free public schools and tax revenue. *See Ste. Genevieve Sch. Dist. R–II v. Bd. of Aldermen,* 66 S.W.3d 6, 11 (Mo. banc 2002) (finding that a taxpayer had standing to seek a declaratory judgment that the city was acting beyond its authority where a redevelopment project would cost the school district and the city future tax revenue).

■ But, as is the case for school districts and their representative organizations, plaintiff taxpayers do not have standing to bring equal protection claims on behalf of public school students generally. *See Comm. for Educ. Equal.,* 878 S.W.2d at 450 (claims of equal protection rights generally may not be raised by third parties).

### 3. Students

■ Defendants additionally suggest that the student plaintiffs in this case lack standing, arguing their claims are rendered moot because they are not currently enrolled in school. But plaintiff students' standing is not moot, as multiple plaintiff students remain in the public school system. Further, plaintiff students who are no longer in Missouri's public schools have claims that are not moot because they present claims capable of repetition that otherwise may evade review. *See In re*

14. The three taxpayers are W. Bevis Schock, Rex Sinquefield, and Menlo Smith (collectively Defendant–Intervenors).

15. This case was commenced in 2004, but Defendant–Intervenors did not seek to join the case until October 2006, three months prior to its January 2007 trial setting.

16. The State defendants do not join in Defendant–Intervenors' arguments to this Court regarding permissive intervention.

*1983 Budget for Circuit Court of St. Louis County,* 665 S.W.2d 943, 943 n. 1 (Mo. banc 1984) (noting that claims capable of repetition that otherwise may evade review need not be considered moot).

In sum, having determined that at least one plaintiff has standing as to each claim, the merits of each of Plaintiffs' challenges to SB287 are addressed below. *See Massachusetts v. EPA,* 549 U.S. 497, 518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (stating the rule that only one of the plaintiffs needs standing to permit consideration of a claim).

### B. Defendant–Intervenors

■ Plaintiffs argue that the trial court erred in granting permissive intervention to three taxpayers seeking to join the State's defense of SB287's school funding formula.[14] Defendant–Intervenors sought to join this case shortly before the trial,[15] and their motion to intervene was opposed by Plaintiffs and the State.[16] Plaintiffs asserted that permissive intervention was improper because Defendant–Intervenors asserted no interest apart from that of general taxpayers.[17] The State highlighted that Defendant–Intervenors asserted no property or transactional interests in the constitutional validity of the school funding formula, and it asserted that it adequately could guard the public's

17. Defendant–Intervenors assert that Plaintiffs are too late in contesting the trial court's order permitting intervention. The order permitting intervention, however, was not a final order from which Plaintiffs could have appealed, and Plaintiffs properly raise this issue as part of this appeal. *See Aversman v. Danner,* 577 S.W.2d 910, 911 (Mo.App.1979) (finding interlocutory a decision to permit intervention and noting that "[i]ntervention permitted merely moves the cause forward on the merits with full right reserved at a future date for review on appeal").

interests in defending SB287.[18] The trial court, however, elected to allow Defendant–Intervenors to join as defendants under Rule 52.12(b), permissive intervention. In permitting Defendant–Intervenors to join, the court noted the peculiarity of this case and its statewide significance, but it specifically stated that the State's interests already were adequately represented.

■ This Court reviews permissive intervention for abuse of discretion. *State ex rel. Nixon v. Am. Tobacco Co.*, 34 S.W.3d 122, 131 (Mo. banc 2000). Permissive intervention is provided for by Rule 52.12(b) in three circumstances: (1) when allowed by statute; (2) when an applicant's *claim or defense* and the main action have a question of law or fact in common; or (3) when the State is seeking intervention in a case raising constitutional or statutory challenges. None of these circumstances apply to Defendant–Intervenors. The provision allowing intervention when an applicant's *claim or defense* and the main action have a question of law or fact in common is inapplicable to Defendant–Intervenors because they merely reasserted the State's defenses. Defendant–Intervenors asserted no claim, defense, or interest unique to themselves. They have not shown that the State could not or did not defend its interests adequately. As such, Rule 52.12(b) provided no mechanism by which Defendant–Intervenors could join the State's defense of the constitutional validity of SB287.

■ Further, Missouri's taxpayer standing doctrine does not apply to Defen-

dant–Intervenors, as that doctrine concerns taxpayer *plaintiffs* seeking to restrain the State from improperly spending tax revenue. *See Ste. Genevieve Sch. Dist.*, 66 S.W.3d at 11. Here, Defendant–Intervenors, as *defendants*, neither challenged the State's expenditures nor sought to restrain the State in any manner. Instead, they sought to defend the status quo funding formula, the very position the State took below. Applying taxpayer standing to Defendant–Intervenors would open the floodgates to allow all Missouri taxpayers to seek intervention in the State's defense of constitutional and statutory challenges. No public policy is served by allowing intervention premised on a taxpayer's mere interest in the subject matter of a suit. Defendant–Intervenors here could have sought leave to express their views in an amicus brief, rather than through intervention.

The trial court erred in permitting Defendant–Intervenors to join this case. But this intervention error does not merit reversal unless Plaintiffs were harmed. *Cf. St. Louis County v. Vill. of Peerless Park*, 726 S.W.2d 405, 410 (Mo.App.1987) (finding no prejudice from an intervention by defendants where the plaintiff was found to lack standing and a final judgment already had been entered against the plaintiff, calling the decision to allow intervention "no longer alive").

Plaintiffs have not demonstrated specific harm or litigation costs caused by Defendant–Intervenors' presence in this case. Further, Defendant–Intervenors aver that they have abandoned their previous re-

---

**18.** The doctrine of *parens patriae* creates a rebuttable presumption that the government adequately represents the public's interests in cases concerning matters of sovereign interest. *See Curry v. Regents of Univ. of Minn.*, 167 F.3d 420, 423 (8th Cir.1999) (addressing both permissive and as-of-right intervention); *see also State ex rel. Cooper v. Wash. County*

*Comm'n*, 848 S.W.2d 620, 622 (Mo.App.1993) (finding in an intervention as-of-right matter that a private person is not entitled to intervene "[w]hen a public officer is engaged in litigation to protect public rights, and the officer's pleadings and procedure maintain the public interest").

quests to collect costs from Plaintiffs. Under these circumstances, no material harm to Plaintiffs is evident. Accordingly, the trial court's error in permitting this intervention does not require reversal.

### III. School funding formula does not violate article IX

Missouri Constitution article IX, section 3(b) provides:

In event the public school fund provided and set apart by law for the support of free public schools, [sic] shall be insufficient to sustain free schools at least eight months in every year in each school district of the state, the general assembly may provide for such deficiency; but in no case shall there be set apart less than [25] percent of the state revenue, exclusive of interest and sinking fund, to be applied annually to the support of the free public schools.

Plaintiffs do not argue that the State has failed in its obligations under this section. Instead, Plaintiffs contend that SB287's failure to provide school funding beyond that granted by section 3(b) contravenes Missouri Constitution article IX, section 1(a), because the SB287 school funding formula fails to "adequately" provide the "general diffusion of knowledge and intelligence" mandated by section 1(a).

▄▄▄ The constitutional validity of SB287 and the trial court's interpretation of the Missouri Constitution are questions of law given *de novo* review. *City of Arnold v. Tourkakis*, 249 S.W.3d 202, 204 (Mo. banc 2008). Legislative acts are entitled to deference, and this Court must give these acts any reasonable construction to avoid nullifying them. *Bd. of Educ. v. City of St. Louis*, 879 S.W.2d 530, 533 (Mo. banc 1994). In the absence of a constitutional prohibition, the legislature has the power to enact legislation on any subject. *Id.* Constitutional provisions are read in har-

mony with all related provisions. *Neske v. City of St. Louis*, 218 S.W.3d 417, 421 (Mo. banc 2007).

Initially, this Court must determine the significance of section 1(a)'s language as read in harmony with section 3(b). *See id.* Article IX, section 1(a), states:

A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the general assembly shall establish and maintain free public schools for the gratuitous instruction of all persons in this state within ages not in excess of [21] years as prescribed by law.

Notably, the introductory clause in section 1(a) concerning the "diffusion of knowledge" outlines the purpose and subject of Missouri's public education system. But, it provides no specific directive or standard for how the State must accomplish a "diffusion of knowledge." Plaintiffs are attempting to read a separate funding requirement into section 1(a) that would require the legislature to provide "adequate" education funding in excess of the 25–percent requirement contained in section 3(b). Such language does not exist.

The lack of specificity in section 1(a)'s introductory clause can be contrasted with the remainder of section 1(a) that specifically requires free public schools and sets the maximum student age at 21 years. This Court interpreted the directive in the body of section 1(a) in *Concerned Parents v. Caruthersville School District 18*, 548 S.W.2d 554, 559 (Mo. banc 1977). *Concerned Parents* notes that article IX, section 1(a)'s language, as a whole, including the introductory portion of the section, requires the State to provide free public schools that charge no admission or course fees. *Id.* at 562. The introductory clause alone, however, has never been given di-

rect effect, as it is purely aspirational in nature.

Reading a free-standing obligation to provide certain school funding into the introductory language of section 1(a) would be contrary to the specific flexibility afforded the legislature in article IX, section 3(b). *See Comm. for Educ. Equal.,* 878 S.W.2d at 458 (Robertson, J. concurring) (commenting that section 1(a) does not create a substantive funding obligation in the legislature independent of section 3(b)). Section 3(b) does not limit the legislature's power in section 1(a) to establish and maintain free public schools. *See State ex rel. Sharp v. Miller,* 65 Mo. 50 (Mo.1877) (addressing a former version of section 3(b)'s 25 percent requirement and noting that the legislature may appropriate more than provided for in that section). Rather, section 3(b) provides the legislature a flexible framework for funding Missouri's public schools. It indicates the minimum level of funding that the legislature "shall" set aside—at least 25 percent of the state revenue. But it also outlines that the legislature "may" provide additional funding to account for deficiencies. It is the language of section 3(b), not the aspirational introductory language of section 1(a), that provides the constitutional parameters for funding Missouri's public schools.

■■ Plaintiffs' claims that SB287's funding formula is unconstitutional because it fails to provide funding required by article IX, section 1(a) are without merit. Where the legislature has provided the 25 percent of state revenue required by section 3(b), it has not failed in its duty

under section 1(a) to provide free public education. Inasmuch as section 1(a) presents a community aspiration, it is the legislature's prerogative to consider its relevance and act accordingly.[19] The judiciary cannot invade the legislative branch's province to fund schools beyond the requirements of section 3(b). *See, e.g., State ex rel. Crow v. Bland,* 144 Mo. 534, 46 S.W. 440, 446 (1898) ("[U]nder the division of powers in our form of government, we have no right to trench upon the prerogatives of the other co-ordinate branches of our government."). The aspiration for a "general diffusion of knowledge and intelligence" concerns policy decisions, and these political choices are left to the discretion of the other branches of government.

## IV. School funding formula does not violate equal protection

■■ Plaintiffs also contend that SB287's school funding formula violates Missouri Constitution article I, section 2, Missouri's equal protection provision, arguing the formula results in "inadequate" funding to certain school districts and yields differences in per-pupil expenditures among school districts.

■■ Missouri Constitution article I, section 2, guarantees equal rights and opportunities under the law. *Doe v. Phillips,* 194 S.W.3d 833, 845 (Mo. banc 2006). Like the 14th Amendment of the United States Constitution, article 1, section 2 of Missouri's Constitution provides that a law may treat different groups differently, but it cannot treat similarly situated persons differently without adequate justification. *Id.* "What constitutes adequate justifica-

---

**19.** Plaintiffs presented evidence that many districts could not meet their school facility and infrastructure needs sufficiently. Additionally, they pointed to funding needs of early childhood education programs. And they raised the issue of school transportation costs, which are funded separately by the State but which are subject to unaccounted-for funding shortfalls. But, because section 1(a) provides no free-standing funding obligation, these and related arguments are without merit.

tion for treating groups differently depends on the nature of the distinction made." *Id.* Where a law impacts a "fundamental right," this Court applies strict scrutiny, determining whether the law is necessary to accomplish a compelling state interest. *Id.* But, where this Court finds that a fundamental right is not impacted, this Court gives an equal protection claim rational-basis review, assessing whether the challenged law rationally is related to some legitimate end. *Id.*

██ Plaintiffs contend that school funding "adequacy" and per-pupil expenditure equity are fundamental rights in Missouri based on article IX, section 1(a)'s provision for "[a] general diffusion of knowledge and intelligence." Fundamental rights are those "deeply rooted in the nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *State. ex rel. Nixon v. Powell,* 167 S.W.3d 702, 705 (Mo. banc 2005). Education is not a fundamental right under the United States Constitution's equal protection provision. *See San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). And, although Missouri's Constitution may contain additional protections, Missouri courts have followed the general federal approach to defining fundamental rights. *See In re Marriage of Woodson,* 92 S.W.3d 780, 783 (Mo. banc 2003) (quoting *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)).

To resolve Plaintiffs' contention that equitable education spending should be regarded as a fundamental right under the Missouri Constitution, this Court examines Missouri Constitution article IX, which contains specific provisions for education. *See Phillips,* 194 S.W.3d at 843 (stating that "if a particular constitutional amendment provides specific protection for the right asserted ... the alleged violation will be analyzed under that amendment"). Notably, no expressed right to equitable education funding exists in article IX, section 1(a)'s provision for free public schools. And, as stated above, the introductory clause of article IX, section 1(a) does not describe a free-standing right to "adequate" funding.

Further, article IX does not contain a mandate for equitable per-pupil expenditures among districts. Missouri's 1865 Constitution contained language regarding equitable educational funding, but that language was removed in the 1875 Constitution and never has been restored.[20] Missouri's current constitution does not contain such language and instead builds in certain variances. For example, the proceeds of penalties, forfeitures, and fines are placed in the school funds of the individual counties. Mo. Const. art. IX, sec. 7. And article X, section 11(c) allows for varying tax levies in municipalities, counties, and school districts by local vote. The inevitable result of including these and other provisions in the Missouri Constitution is variance in per-pupil spending across districts. There is no constitutional basis for implying an equal per-pupil spending requirement.

██ Because Missouri's education article contains neither a free-standing "adequacy" requirement nor an equalizing mandate, Plaintiffs have failed to show that SB287 impacts a fundamental right. Accordingly, strict scrutiny does not apply. Instead, under rational basis review, this

---

**20.** *See* Mo. Const. 1865, art. IX, sec. 9 ("The general assembly shall ... make such distribution as will equalize the amount appropri-ated for common schools throughout the State.").

Court analyzes whether SB287's school funding formula rationally relates to a legitimate end. *Phillips,* 194 S.W.3d at 845. Rational basis review does not question "the wisdom, social desirability or economic policy underlying a statute," and a law is upheld if it is justified by any set of facts. *Mo. Prosecuting Attorneys & Circuit Attorneys Ret. Sys. v. Pemiscot County,* 256 S.W.3d 98, 102 (Mo. banc 2008) (internal citation omitted).

SB287's funding formula satisfies this highly deferential standard because funding free public schools in Missouri is clearly a legitimate end. *See* Mo. Const., art. IX, sec. 1(a). And funding schools in a way that envisions a combination of state funds and local funds, with the state funds going disproportionately to those schools with fewer local funds, cannot be said to be irrational. As discussed above, no provision of the Missouri Constitution forbids funding in this manner, and no mandate requires that per-pupil expenditures be equal. *See Thompson v. Comm. on Legislative Research,* 932 S.W.2d 392, 394 (Mo. banc 1996) (stating that the legislature has plenary power and may act unless denied power to do so in the constitution). As such, Plaintiffs' arguments that SB287 violates Missouri's equal protection clause are without merit.

## V. School funding formula does not violate the Hancock Amendment

■ Plaintiffs further allege that SB287 is unconstitutional because it violates Missouri's Hancock Amendment, Missouri Constitution article X, sections 16 through 24. In particular, Plaintiffs assert that the State violated section 16 of the Hancock Amendment by requiring new programs without funding them and violated section 21 by reducing the state-financed portion of certain education programs.

Section 23 of the Hancock Amendment provides specific types of relief to taxpayers:

> **Taxpayers may bring actions for interpretations of limitations[: ]** Notwithstanding other provisions of this constitution or other law, any taxpayer of the state, county or other political subdivision shall have standing to bring suit ... to enforce the provisions of sections 16 through 22, inclusive, of this article and, if the suit is sustained, shall receive from the applicable unit of government his costs, including reasonable attorneys' fees incurred in maintaining such suit.

Mo. Const. art. X, sec. 23.

■ This Court has noted that this section's heading, "Taxpayers may bring actions for interpretations of limitations," merely authorizes declaratory relief. *See Taylor v. State,* 247 S.W.3d 546, 548 (Mo. banc 2008). And "[t]he limited nature of the declaratory, or interpretive, remedy does not authorize a court to enter a judgment for damages or injunctive relief." *Id.* Indeed, as the general purpose of the Hancock Amendment is to limit governmental expenditures, this Court has found that section 23 cannot be read as a waiver of sovereign immunity for money judgments against the State. *See Fort Zumwalt Sch. Dist. v. State,* 896 S.W.2d 918, 923 (Mo. banc 1995) (stating that section 23 does not constitute consent to a suit for a money judgment to enforce section 21). Rather, a proper remedy is "a declaratory judgment relieving a local government of the duty to perform an inadequately funded required service or activity." *Id.*

■ In this case, however, Plaintiffs expressly do not seek to have plaintiff school districts released from any alleged unfunded obligations. Instead, they in essence request a declaratory judgment that

results in increased funding. This remedy is unavailable under the Hancock Amendment.

For support of its requested remedy, Plaintiffs point to *Taylor*'s statement that "[i]nherent in the courts' power to enter a declaratory judgment ... is the power of the court to enforce the judgment through other forms of relief where a party acts contrary to a court's declaratory judgment." 247 S.W.3d at 549. This inherent power, however, provides no remedy under section 23. *See, e.g., City of Jefferson v. Mo. Dep't of Natural Res.*, 916 S.W.2d 794, 796 (Mo. banc 1996) (applying this rule to find the remedy for a Hancock violation was noncompliance with the mandate until the state actually reimbursed the city for its increased costs). Because Plaintiffs expressly disaffirm that they seek to be re-

leased from any mandate, their Hancock Amendment challenge necessarily fails.[21]

## VI. School funding formula does not violate article X or other statutes

Plaintiffs argue that SB287's funding formula is unconstitutional under Missouri Constitution article X, sections 3, 4, and 14, and that it violates several Missouri statutes.[22] They contend that the State Tax Commission did not follow the mandates found in these constitutional and statutory provisions in reporting its 2004 assessments for school funding purposes. More particularly, they allege that the legislature acted unlawfully when incorporating and freezing the Commission's 2004 property tax assessments into SB287's school funding formula.[23] They contend that use of these allegedly flawed 2004 assessments render incorrect the "local ef-

---

**21.** In addition to finding that Plaintiffs' requested remedy was unavailable under the Hancock Amendment, the trial court also found that Plaintiffs' substantive arguments regarding preexisting and new mandates were without merit. Regarding the substantive arguments, the trial court found that Plaintiffs' evidence was insufficient because it failed to provide the required budgetary evidence of changes in state reimbursement rates, evidence of costs in 1980 to 1981, and evidence of the related funding ratios. *See Fort Zumwalt*, 896 S.W.2d at 922. Plaintiffs also pointed to new performance and accountability standards in SB380, but the trial court found that these standards were not proven to be "required" activities or services as contemplated by the Hancock Amendment. *See* Mo. Const., art. X, sec. 21; *Miller v. Dir. of Revenue*, 719 S.W.2d 787, 788 (Mo. banc 1986).

**22.** Article X, section 3, provides that "taxes shall be uniform upon the same class or subclass of subjects;" section 4 contains multiple subsections addressing the classification of property for tax purposes and the percentage of "true value" that may be employed; and section 14 addresses the establishment of the State Tax Commission and provides that the

Commission is "to equalize assessments as between counties."

The statutes that Plaintiffs argue violate SB287 include: section 138.380 ("Duties and powers of commission," setting out the Commission's tasks regarding raising or lowering of assessed valuations and obtaining of related reports containing this raw data, among other tasks); section 138.390 (describing the Commission's duties regarding the equalization of valuations among the several counties); section 138.445 (concerning the Commission's duties related to a certification of the property valuations' annual report). Plaintiffs also allege violations of section 138.395, which, as relevant in 2004 set out the Commission's duties to report "equivalent sales ratios" for use in determining "equalized assessed valuations" factored into the school funding formula. Sec. 138.395, RSMo 2000 (repealed).

**23.** Plaintiffs suggest that Department of Elementary and Secondary Education (DESE) acted irrationally by using the Commission's data. But, DESE was simply in the position of receiving data reported by the Commission. *See* Sec. 138.395, RSMo 2000 (repealed) (stating that the Commission shall certify the equivalent sales ratio to DESE).

fort" calculations of SB287's funding formula, leading to the improper distribution of state funds. *See* section 163.011(1).

■ To prevail, Plaintiffs must show that SB287's funding formula conflicts with the constitutional provisions they have raised. *See Cannon v. Cannon*, 280 S.W.3d 79, 83 (Mo. banc 2009) (noting that a statute will be held invalid if it conflicts with the constitution). As relevant to their argument, the constitutional and statutory provisions cited by Plaintiffs speak on their face to what the Commission must do and outline certain procedures for these mandates. For example, article X, section 3 requires that "taxes shall be uniform upon the same class or subclass of subjects." But Plaintiffs do not allege that the legislature has promulgated a statute that itself levies non-uniform taxes; rather, they allege that the legislature wrongly relied on the Commission's 2004 property assessment figures. Similarly, article X, section 14 requires that the Commission equalize assessments. But this provision does not indicate what the legislature may or must do regarding the Commission's assessments.

The separate opinion criticizes the equality of Missouri's tax assessment scheme and the assessment data the Commission calculated, and it further highlights that unconstitutionally disparate taxation is disallowed pursuant to this Court's opinion in *State ex rel. School District of City of Independence v. Jones*, 653 S.W.2d 178 (Mo. banc 1983). The Commission was a party to *Jones*, 653 S.W.2d at 180–81. The Commission, however, was never joined as a necessary party to this case, which prevents evaluation of its actions. *See* Rule 52.04 ("Joinder of Persons Needed for Just Adjudication"). Plaintiffs implicitly recognized this when they expressly abandoned any direct attack on the propriety of the Commission's property tax assessment procedures and equalization methods under Missouri law.

For these reasons, although the separate opinion raises complex and important issues concerning Missouri's assessment scheme and its relationship to educational financing, the question of equalizing assessments is for another day. This Court's role is limited to deciding the issues before it and not making advisory opinions. *See City of Springfield v. Sprint Spectrum, L.P.*, 203 S.W.3d 177, 188 (Mo. banc 2006) (recognizing that this Court has no authority to render an advisory opinion); *Schottel v. State*, 159 S.W.3d 836, 841 (Mo. banc 2005) ("[t]his Court cannot offer advisory opinions on issues that may arise in the future").

■ Plaintiffs additionally cannot show that the constitutional provisions they invoke restrict the legislature's discretion in shaping the school funding formula.[21] And, in the absence of a constitutional bar, it is clear that the legislature has plenary power to act in crafting the school funding formula. *See Thompson*, 932 S.W.2d at 394.

Lacking an actual conflict with the Missouri Constitution, Plaintiffs are left to argue that the legislature acted irrationally or arbitrarily when relying on the Commission's 2004 assessment data. They criticize the quality of the Commission's data by presenting the PPRC Report demon-

---

**24.** Moreover, even if the funding formula found in SB287 actually conflicted with earlier statutes, it does not follow that the current funding formula statute would be unlawful. *See Turner v. State*, 245 S.W.3d 826, 829 (Mo. banc 2008) (noting that where "two inconsis-

tent statutes purport to be complete and independent legislation" the "later-enacted provision, even when there is no specific repealing clause, repeals the first statute to the extent of any conflict with the second").

strating the Commission's assessment flaws and pointing to aspects of the Commission's assessment practices that did not conform to statutory and constitutional provisions.[25] There is, however, no record basis to hold, as the separate opinion suggests, that the legislature's reliance on the Commission's 2004 assessment data was irrational.

Plaintiff's reliance on the PPRC Report is misplaced, as the PPRC Report was created after the passage of SB287, and the legislature did not have this information available when debating revisions to the school funding formula in 2005. Moreover, property assessment is not an exact science, and, even were the Commission's 2004 data imperfect, use of that data was not an irrational act by the legislature. The joint committee studying Missouri's school funding formula in 2004 found that the school funding system suffered from inequities and deficiencies. Its report called for a new formula. The legislature, responding to these and other findings, constructed a new school funding system during the 2005 legislative session. This system incorporated the most current information then available from the Commission, the 2004 data. The argument that a perhaps better or more proper assessment practice was available to the Commission is not determinative under the rational basis review afforded SB287. *See Pemiscot County*, 256 S.W.3d at 102–03. Further, Plaintiffs' evidence did not go unchallenged. Defendants presented testimony that the Commission's assessment data did not necessarily provide an inferior indicator of property value as compared to sales data, and in some cases Defendants' approach may hold certain advantages as it opens up a greater pool of data. The legislature's reliance on the Commission's data was permissible because it was a rational attempt toward the legitimate end of funding Missouri's free public schools.

Although judicial review of legislative enactments is fundamental to our system of checks and balances, hindsight evaluation of the quality of data on which the legislature relied is not appropriate in this case. Assessing the wisdom of the legislature's reliance on the Commission's data would invade the legislature's deliberative process and violate the separation of powers between the judicial and legislative branches of government. *See Pemiscot County*, 256 S.W.3d 98, 102–03 (stating that rational basis review merely asks if any set of facts can be reasonably conceived to justify the law).

Similarly, this Court finds no basis to declare the decision to phase in SB287 over seven years irrational, nor is the act of freezing in the 2004 data irrational. By phasing in the formula, the legislature may have wished to promote continuity between the old and new funding systems. Further, freezing the assessment data used is consistent with the historical practice of revisiting the school funding formula approximately every 10 years. *See Final Report of the Joint Interim Committee on Education* (Feb. 15, 2004). Likewise,

---

**25.** These alleged flaws include the Commission's assumption that assessment data from various counties were equalized among counties, without actually affirmatively equalizing the figures. *See* Mo. Const. art. X, sec. 14 (stating that the Commission is to equalize assessments among counties). Plaintiffs also point to the Commission's use of "appraisal ratios" instead of "sales ratios" and its failure to use a certificates of value (COV) method for sales reporting. *See* Sec. 138.395, RSMo 2000 (repealed). There is no statutory requirement that the COV method be used in every county, but four counties currently do require its use. With this, they presented evidence that the Commission's property tax assessments did not in fact represent the "true value" of properties. *See* Mo. Const. art. X, sec. 4.

the legislature could choose to rewrite the funding formula at any time. Inasmuch as Plaintiffs express concern over possible funding deprivations after 2013, that concern is merely speculative.

SB287 does not conflict impermissibly with the provisions highlighted by Plaintiffs, and it survives rational basis review. As such, Plaintiffs' assessment arguments are unpersuasive.

## VII. Conclusion

For the foregoing reasons, this Court finds no error in the trial court's findings upholding the constitutional validity of SB287's school funding formula. The trial court's judgment is affirmed.

PRICE, C.J., BRECKENRIDGE, FISCHER and LAURA DENVIR STITH, JJ., and PARRISH, Sp.J., concur.

WOLFF, J., concurs in part and dissents in part in separate opinion filed.

TEITELMAN, J., not participating.

MICHAEL A. WOLFF, Judge, concurring in part and dissenting in part.

In Lake Wobegon, "all the children are above average."[1] In Missouri, all the children in public schools will get an "adequate" education under the state's revised school finance law. The children of the fictional Lake Wobegon all cannot be above average, as a matter of simple math, but one never should underestimate the power of belief.[2] Adequacy, on the other hand, theoretically can be achieved for all, and the new school funding law sets a standard for adequacy of funding. Unfortunately, however, the school funding law's math does not always work; even the modest goal of adequacy is beyond the reach of many school districts. Moreover, the quest of some local school districts to exceed adequacy is made more difficult because of the constitutional violations in the property tax system on which the school funding law relies. Adequacy, as defined in the law, is a fiction for many of Missouri's districts.

I agree with the majority that the Court's inquiry here should be limited to specific constitutional provisions. But the majority should adhere to that principle. I concur in the principal opinion's conclusions that the Missouri Constitution does not mandate equality among school districts and that the school funding law meets the constitutional requirement that the state spend no less than 25 percent of its revenue on public education. But I respectfully dissent from the majority's refusal to provide a remedy for the violation of specific constitutional requirements as to property tax assessments.

The General Assembly, in its revision of the school funding system in Senate Bill No. 287 (2005), is phasing in a new system on the foundation of a property tax system that violates specific provisions of the Missouri Constitution. When legislation perpetuates a constitutional violation, the Court has a duty to say so and to grant relief, just as it does when legislation directly violates the constitution.

1. The Public Radio International program, "A Prairie Home Companion," features the news from Lake Wobegon whose creator, Garrison Keillor, describes the inhabitants: "all the women are strong, all the men are good looking, and all the children are above average." *See generally*, GARRISON KEILLOR, LAKE WOBEGON DAYS (1985).

2. It is mathematically impossible for all the children to be above average if one includes only the children of Lake Wobegon. If one wishes to compare the children of the United States with schoolchildren of some other countries, the American children might be below average. *See* GLADWELL, *infra* note 50, at 259–60.

Because education is a fundamental purpose of state government, I will elaborate on the practical context and meaning of the influencing forces, the constitutional provisions and the laws affecting the funding of public education to show the importance of enforcing the Missouri Constitution's strictures.

### Education as a Fundamental Purpose of Government

The majority opinion seems to reject the notion that education is a fundamental right, citing *San Antonio Indep. Sch. Dist. v. Rodriguez*[3] and this Court's supposed practice of following the federal approach to defining fundamental rights.[4] The practice of following the federal approach to individual rights guaranteed by the Bill of Rights may make sense because of the parallel provision of both constitutions but on the subject of education this approach makes no sense. The federal constitution says nothing about education. The Missouri Constitution, on the other hand, has many provisions for education, a traditional role of the state government.

The proper approach to these questions—as a matter of state, not federal law—is to inquire whether education of the children of Missouri is a fundamental *purpose* of state government. The Missouri Constitution makes education more than simply a major activity of government; education of children is one of the government's central purposes prescribed at length in our constitution.

The fundamental purpose of government in American society, well understood by the founders and inherent in our souls, is to enhance and protect the opportunity of individuals to accrue wealth as their abilities and energies allow.[5] There is a fundamental belief that we Americans are guaranteed equality of opportunity, not equality of result, especially when it comes to the distribution of the government's benefits. Because of this belief, we are repulsed by governmental actions and policies that rig the distribution of government favors so that some citizens cannot access the advantages the government offers to others.

Not every inequality of distribution is a denial of equal protection of the law. Some inequalities can be labeled as simply unfair. Unfairness can be addressed through the political process; it need not always be a concern of the courts to rectify

---

**3.** 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

**4.** The question of whether something is a "right" or a "fundamental right" in our jurisprudence is the starting point of familiar legal analysis as to whether the government has violated someone's "right." A similar function is assigned to the notion of equality as embodied in the equal protection clause of the United States Constitution and a corresponding provision of the Missouri Constitution. U.S. CONST. amend. XIV; MO. CONST. art. I, sec. 2. If something is a "fundamental" right, an unequal availability of that "right" must be justified by a compelling governmental interest. If a government's classification of its citizens is based on some suspect criterion—race being the major example—then the classification must be justified by a compelling

governmental interest. Some classifications, *e.g.,* gender, are measured by intermediate scrutiny. Other classifications are tested by whether they are rational, a test that governmental actions usually pass. *See, e.g., Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); *State Bd. of Registration for the Healing Arts v. Giffen,* 651 S.W.2d 475, 479 (Mo. banc 1983). These familiar lines of analysis seem shop-worn, and their use often seems rote. Their use in this case, moreover, seems strangely beside the point.

**5.** *See* JAMES MADISON, FEDERALIST PAPER No 10: "The diversity in the faculties of men, from which the rights of property originate, is not less an insuperable obstacle to a uniformity of interests. The protection of these faculties is the first object of government."

by constitutional adjudication. Put another way, not every political problem needs to be expressed and solved as a legal problem.[6]

Inequality is assured by the means the Missouri Constitution authorizes for the delivery of education—that is, local school districts to set tax rates and provide education. This system by its local orientation produces inequalities of results in the money various districts spend on education.

The disparities are stunning. The highest spending district spends $15,251 per pupil and the lowest-spending district spends $4,704 per pupil.[7] The Missouri Constitution is not blind to these inequalities. If anything, its structure produces them. The constitution authorizes the use of taxation of local property to produce money for schools, as well as for local governments.[8] This system produces unequal results and leaves it to the political process in the legislature to remedy or to mitigate the inequalities. These unequal results show the unfairness of the system established under the state constitution and set up by legislation.

These unequal results pose a simple question that is hard to avoid and even harder to answer: What makes the children of one school district deserving of only about one-third of the education money available for the schools of the children in the highest-spending district?

Because the state constitution seems to authorize this absurdly unequal structure, the question is one of policy, not law.[9] The gross disparities created or tolerated in the system, however, ought to make courts especially attentive to particular constitu-

6. This seems at odds with the familiar observation of Alexis de Tocqueville DEMOCRACY IN AMERICA written in the 1830's, that "scarcely any political question arises in the United States that is not resolved, sooner or later, into a judicial question." 1 Democracy in America 280 (1945). There is, however, De Tocqueville's further observation quoted in the majority opinion in *Sierra Club v. Morton,* 405 U.S. 727, 740 n. 16, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (citing 1 DEMOCRACY IN AMERICA at 102) on when such judicial questions need to be decided: "It will be seen, also, that by leaving it to private interest to censure the law, and by intimately uniting the trial of the law with the trial of an individual, legislation is protected from wanton assaults and from the daily aggressions of party spirit. The errors of the legislator are exposed only to meet a real want; and it is always a positive and appreciable fact that must serve as the basis of a prosecution." De Tocqueville in the familiar quotation may have been on to something when one considers the contemporary conflicts over whether judicial nominees will be "activist" judges, a term whose meaning differs depending on where on the contemporary political spectrum one places oneself.

7. The record includes the Department of Elementary and Secondary Education report "Current Expenditures per Eligible Pupil Data (Low to High Order)" for the Fiscal year 2004–2005 which shows that the expenditure per eligible pupil ranged from $4,704.11 in the Diamond R–IV School District (Newton County) to $15,251.28 in the Gorin R–III School District (Scotland County). The three highest districts, Gorin R–III, Clayton, and Climax Springs R–IV, spent greater than $13,000 per pupil. The three lowest-spending districts, Diamond R–IV, Willard, R–II, and Clever R–V, spent less than $4,900 per pupil.

8. If one is disturbed by the inequalities of property taxes, one simply should imagine local taxation based, instead, on local incomes or on local retail sales. Property wealth, it seems to me, is far more evenly distributed throughout the state than income or retail sales even though the property tax wealth per pupil of the wealthiest districts is 15 to 20 times that of poor districts. *See* n. 21.

9. As noted, the United States Supreme Court refused to apply the Equal Protection Clause of the Fourteenth Amendment to inequalities in school funding. *San Antonio Indep. Sch. Dist.,* 411 U.S. 1, 93 S.Ct. 1278.

tional requirements such as taxation of property tax wealth.

As to taxation, the constitution has specific requirements that are judicially enforceable. It requires the equalization of assessed valuations so that individual districts are not unduly disadvantaged in the ability to raise money, a disadvantage that results from unequalized and low assessments of the properties on which the taxes are imposed.

Within the constitutional framework of local school districts supported by local property taxes, the people of this state in the years since statehood in 1821—through constitutions adopted and through legislatures elected—have made education a fundamental purpose of their government. The specificity of the state constitution's provisions for education and taxation requires that the Court apply those provisions faithfully.[10]

This appeal deals with two specific constitutional provisions—the requirement that no less than 25 percent of state revenues be devoted to education and the requirement that the taxation of property wealth necessary to support education be equalized among counties. Mo. CONST. art. IX, sec. 3(b);[11] Mo. CONST. art. X, sec. 14 [12] . The majority opinion seems faithful to the 25 percent requirement for education

but fails in its application of the taxation provisions that are a necessary part of the government's ability to perform this fundamental purpose.

The Court's failure to enforce the specific provisions of the constitution rigs the system of education so that opportunities it provides are distributed inequitably and contrary to the manner and purposes set forth by the people who enacted the constitution.

## From Equity to Adequacy

Education in Missouri is a state function. Mo. CONST. art. IX, sec. 1(a); *see also Bd. of Educ. of City of St. Louis v. Missouri State Bd. of Educ.*, 271 S.W.3d 1 (Mo. banc 2008). Funding of that function is a combination of local, state and federal sources. All such funding follows prescriptions in the state constitution and laws. *Id.*

Changes in the system of school finance are the province of the state legislature so long as they adhere to the constitution. The legislative process by its nature creates winners and losers, relatively speaking. The legislature has wide latitude to make these choices. Constitutional limits exist to keep the choices within certain prescribed bounds, which in this case would keep the system from being unduly

10. *See Mallory v. Barrera*, 544 S.W.2d 556 (Mo. banc 1976); *State ex rel. Sikeston R–VI Sch. Dist. v. Ashcroft*, 828 S.W.2d 372 (Mo. banc 1992); *Comm. for Educ. Equal. v. State*, 967 S.W.2d 62 (Mo. banc 1998).

11. Mo. CONST. art. IX, sec. 3(b) provides:
    In event the public school fund provided and set apart by law for the support of free public schools, shall be insufficient to sustain free schools at least eight months in every year in each school district of the state, the general assembly may provide for such deficiency; but in no case shall there be set apart less than twenty-five percent of the state revenue, exclusive of interest and

sinking fund, to be applied annually to the support of the free public schools.

12. Mo. CONST. art. X, sec. 14 provides:
    The general assembly shall establish a commission, to be appointed by the governor by and with the advice and consent of the senate, to equalize assessments as between counties and, under such rules as may be prescribed by law, to hear appeals from local boards in individual cases and, upon such appeal, to correct any assessment which is shown to be unlawful, unfair, arbitrary or capricious. Such commission shall perform all other duties prescribed by law.

rigged to favor winners who can muster legislative majorities.

With the help of various state courts and school finance experts, the focus of litigation and legislative efforts has shifted from concerns about "equity" to "adequacy."[13] This shift is evident in the recent changes that have occurred in the funding formula that is challenged in this lawsuit, which started mainly as a challenge on equity grounds to the state's 1993 school funding formula. The 1993 law, in turn, was enacted in part as a response to a court judgment that held the state's school financing was so inequitable as to be constitutionally deficient.[14]

As in other states, experience has shown that it has not been economically and politically feasible to provide equal resources to every school district within a state. Nor, as noted, can it be said that a constitution that relies on local school districts and local taxation to support education is a constitution that demands equality between and among those districts. Accordingly, litigation and legislative "reforms" have focused on the more modest goal of providing a so-called "adequate" education to children in every district, regardless of a district's property wealth.[15]

The stumbling block to equality—and the barrier to some districts that may wish to aim for something more than "adequacy"—is the fundamental premise that schools are mainly a matter of local concern, to be financed principally at the local level and controlled by local citizenry. Financial reality reinforces this premise, because the school finance system is built on a property tax system that is the main support of local school districts.

From its humblest agrarian roots, public education has maintained its distinctly local flavor,[16] despite the infusion of money

13. The litigation of public school finance issues has spawned a class of experts who testify as to whether constitutional standards are met, as the record in this case shows. These experts, who have mastered the mind-numbing complexities of school finance, also consult in the legislative process to design financing schemes that can pass state constitutional muster. The principles involve matters of state constitutional law in the 40 or so states that have experienced school finance lawsuits since the United States Supreme Court declared in 1973 that the equal protection standards of the 14th Amendment do not apply. *San Antonio Indep. Sch. Dist.*, 411 U.S. 1, 93 S.Ct. 1278.

14. *Comm. for Educ. Equal. v. State*, Memorandum Opinion and Judgment of January 15, 1993, Case No. CV190–1371CC, Cole County Circuit Court, *rev'd Comm. for Educ. Equal. v. State*, 878 S.W.2d 446, 454 (Mo. banc 1994) on other grounds, was known popularly as the "Kinder decision," one of those rare cases known by the name of the trial court judge rather than by a litigant's name.

15. I put quotes on the word "reform" as this word is always a matter of opinion that is arguable at best. "Adequacy" is a term of art

that now has a statutory definition—$6,117 per child in 2007 and 2008. The so-called "adequacy target" is determined according to the calculation set forth in section 163.011(18), RSMo Supp.2008. (The concept of adequacy does not seem to be applied uniformly, as I will discuss in this opinion).

16. As a point of personal reference regarding the local flavor of public education, I use the example of my mother, who at age 17 was the sole teacher in a rural one-room school during the Great Depression. During my mother's tenure at this school, the school's one room had pupils from first through sixth grades, ranging in age from 6 to 17 years old. School attendance during the year was confined to the months when the children were not needed to work the farms, and the advanced age of some of the students shows the precedence that agricultural work had to have for some families. The teacher boarded with the families of the children and was paid a small stipend each month. Apart from the diploma she received after graduating from a small rural high school, my mother's only training for this weighty task was a several-month-long teacher certification program. My mother's history as a student and teacher

from the state, which comes with state standards related to quality, and the infusion of federal requirements that in recent years have been accompanied by some modest financial support.[17] State funding became imperative once it became clear that local sources were inadequate to meet the challenge of making students competitive in a regional economy. Federal support has increased with the realization that our children are competing in a global marketplace, though the federal government—which in recent years has provided about eight percent of Missouri's school funding—thus far seems more adept at imposing requirements than in providing money. Perhaps some federal "stimulus" money will help.[18]

The perception of the local character of public education serves two purposes in the modern era. First, the funding of public education is heavily dependent on local property taxes. In Missouri, local property taxes provide more than 40 percent—or about $3 billion annually—for the support of public schools.[19] Sixty percent

of all property taxes go to funding local schools. It is important, therefore, to maintain the support of the local voters who must approve property tax rates and who vote on bond issues for school construction and other capital needs. Over the long run, local efforts to fund public education have been the most effective means of raising money for schools, perhaps because of a strong motivation to gain an advantage for *our own* children.

Second, the view of school funding as "local" mitigates the shame that otherwise might be felt when one compares the disparities of resources available across the state. These disparities—where the lowest spending districts have only one-third of the money of the highest-spending districts—persist despite the fact that the entire scheme of funding public education is dictated by state law under the authority of the state constitution.[20] For instance, the property tax wealth per pupil in the wealthiest districts is 15 to 20 times that of the property tax wealth per pupil in the poorest districts.[21]

---

in the agrarian Midwest embodies the roots of our modern educational system—built from the ground up at the local level, supported by local property taxpayers and controlled by local citizenry. While hardly anyone would consider this schooling adequate today, its rudimentary teaching of reading, writing and arithmetic probably was considered adequate to deal with the complexities of that era.

17. *See* Outstanding Schools Act, section 160.500 et seq., RSMo Supp.2008; No Child Left Behind Act, 20 U.S.C. 3601 et seq. (2008).

18. Federal "stimulus" money is coming with, of course, strings attached. David Hunn, *Stimulus sends $114 million extra to area schools, but impact is unknown*, St. Louis Post-Dispatch, July 31, 2009, at 1A, *available at* http://www.stltoday.com/stltoday/news/stories.nsf/education/story/4B59A1718E16991 D86257604000251C8?OpenDocument.

19. For most recently reported school expenditures, local and county revenue, most of

which is property tax, provide 44.1 percent; state appropriations provide 37.9 percent; Proposition C, the statewide sales tax, produces 9.9 percent; and federal funds provide 8.1 percent of receipts for Missouri's school districts, according to the *2005–2006 Report of the Public Schools of Missouri* issued by the state board of education as required by section 161.092, RSMo Supp.2008.

20. Article IX, section 3(b) of the Missouri Constitution requires that the state contribute no less than 25 percent of state revenue to the funding of public schools. To administer state aid pursuant to this mandate, the legislature enacted section 163.011(10)(a) et seq., RSMo Supp. 2008.

21. This number, which varies a bit from year to year, is derived from dividing the property valuation of a district by the number of pupils, as set forth in the annual *Report of the Public Schools of Missouri issued by the state board of education*.

Because different districts end up with different monetary results, a racecourse analogy may be used, because the word "curriculum" is derived from the early Latin word for racecourse.[22] It may be said that the "good" districts are winning a race, but one should acknowledge that the state has given each district a different starting point or that the state has made the racecourse uphill for some districts and downhill for others. The least we can do is to avoid adding to their humiliation by saying that poor districts are losing because they are bad districts . . . they do not try hard enough to support local schools, the neighborhoods are less supportive and the parents . . . well, you see my point. This system—statewide in design but local in its effects—is rigged.

Those of us who live in urban areas are aware that residential real estate prices are affected by the perceptions about the quality of the schools in a district. The rich districts get richer because desirable schools help to raise property values, and higher property values make it easier for the schools to get more property tax revenue. One can imagine that, given a choice of parents, a child might choose wealthier parents than he or she was given. One might also imagine that a child would choose a school district with greater resources than the one that serves his or her family. While it is absurd to suggest that a child could choose his or her parents, it is not at all absurd to suggest that the state should mitigate the effects of the choice that the child was not given as to his or her school district. Establishing a standard of adequacy may seem to be a step toward mitigating the effects of the child's family circumstances, but the cur-

rent effort seems paltry in light of the stakes involved.

Despite the establishment of an adequacy standard, the short-run advantage gained by wealthier districts may not be for the common good in the long run. We act locally in the belief that we are doing the best for our own children, but in today's highly mobile society, in our local areas we really are educating the future citizens of other communities. The child growing up today in Hannibal, Nevada, or Tarkio (to pick a few towns more or less at random) may be the citizen of Cape Girardeau, Kansas City, or Springfield tomorrow. The advantage that we seek for *our* child of today is not just with others in his or her community but those in the child's future community. Because the marketplace within which the child must compete now is recognized as global, the provision of education—always a fundamental purpose of Missouri's government—takes on profound importance in an increasingly education-driven marketplace.

### Public School Funding Lawsuits

The local nature of public schools has been at the heart of three waves of litigation that have occurred in the past 60 years. The first was racial desegregation, which included claims that education resources were distributed discriminatorily; the second wave was school-finance lawsuits aimed at achieving equity in financing between and among local districts; and the third, and current, wave expresses a "right" to an "adequate" education.

To the extent gains have occurred in public education as a result of these waves of litigation, they are largely the result of legislative efforts, sometimes grudging, to do what seems needed to avoid constitu-

---

22. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 557 (1993). The later Latin term refers to the "course of a year." *Id.*

tional conflicts between courts and legislatures, especially in the area of school finance. Such legislative action illustrates the importance of school finance challenges brought in state courts.[23]

Since 1974, litigants have challenged the school finance structures in over 40 states, and nearly 20 state supreme courts have declared their states' funding schemes unconstitutional.[24] Successful challenges, however, have not resulted in equal funding in states where school funding schemes have been declared unconstitutional.[25] This is not surprising. To ensure that all school districts within a particular state have equal resources, the state's legislature would have to do one of two things: raise all district funding to the level of the district in the state with the greatest funding *or* reduce the funding of wealthier districts to a designated level by placing a cap on the funding local districts can raise.[26] Neither of these scenarios is realistic or attractive: Budgetary limitations

make the first measure financially impossible,[27] and popular reaction to mandated school funding caps makes the second solution politically infeasible.[28]

Without a workable way to equalize district funding, the disparities caused by differing property values seem inevitable.[29] Life, it often has been said, is unfair.

Shifting away from an equality-based argument, litigants in more recent school funding cases have based their constitutional challenges on principles of adequacy.[30] Rather than arguing that states must provide equal resources to all districts, recent litigants, like the appellants in this case, argue that all students should receive the benefit of funds necessary to finance an adequate education.[31] Unlike an equality-based argument, an argument based on adequacy of school funding does not interfere very much with the perception that school resources are a local mat-

23. In discussing the origins of school finance reform, it is important to acknowledge the connection between early school finance litigation and the civil rights movement. James E. Ryan & Michael Heise summarize this connection in *The Political Economy of School* Choice, 111 YALE L.J. 2043 (2002):

> School finance litigation began at a time when many civil rights advocates were growing frustrated with the slow and uneven pace of school desegregation. Advocates hoped that by attacking funding inequalities, they would be able to improve the education available to poor and minority students. Like desegregation proponents, early school finance reformers essentially proposed a tying strategy. Whereas school desegregation would tie the fate of white and black students together by placing them in the same schools, school finance equalization would tie the fate of poor and wealthy schools together by ensuring equal access to resources.

*Id.* at 2058–59.

24. *Id.* at 2059 (citing James E. Ryan, *Schools, Race, and Money,* 109 YALE L.J. 249, 266–69 & nn. 70–86 (1999)). *See also* Anna Williams

Shavers, *Rethinking the Equity vs. Adequacy Debate: Implications for Rural School Finance Reform Litigation,* 82 NEB. L. REV. 133 (2003); William S. Koski and Rob Reich, *When "Adequate" Isn't: The Retreat from Equity in Educational Law and Policy and Why It Matters,* 56 EMORY L.J. 545 (2006).

25. Ryan & Heise, *supra* note 23, at 2059.

26. *Id.* at 2060.

27. *Id.* (citing U.S. GEN ACCOUNTING OFFICE, SCHOOL FINANCE: STATE EFFORTS TO EQUALIZE FUNDING BETWEEN WEALTHY AND POOR SCHOOL DISTRICTS (1998); Peter Enrich, *Leaving Equality Behind: New Directions in School Finance Reform,* 48 VAND. L.REV. 101, 104–05 (1995)).

28. *Id.*

29. *Id.*

30. *Id.* at 2059.

31. *Id.*

ter.[32]

## School Funding Choices

Ultimately, school funding choices—including, especially, the laws that treat schools as "local"—are policy decisions that will be decided by legislatures. The two recent changes in Missouri's school funding formula, in 1993 and 2005, show two different approaches to the state's efforts to support local schools. With the transition from the 1993 to the 2005 version, the system currently has some of each.

Disparities or inequities prompted the change in the state's foundation formula in 1993, as I have noted. The 1993 school foundation formula addressed the disparity question without, of course, actually eliminating disparities. The 1993 formula was designed to give school districts some "equal access" to funding—that is, a certain amount of "local effort," as measured by the district's property tax rate, would yield a certain amount of money per-pupil regardless of a district's property wealth. Theoretically, two school districts with the same property tax rate—i.e., the same "local effort"—should have the same amount to spend per pupil, even though one district may have more property tax wealth per pupil. The formula would equalize the two districts by giving more aid per-pupil to the less wealthy district. The 1993 law did raise substantially more money for property-tax-poor districts, but large disparities with wealthy districts remained. Rather than eliminate disparities, the 1993

law attempted to shift the cause of disparities from lack of wealth to lack of local effort.[33]

Substantial disparities remained because of the great disparities in the ability of districts to raise money through property taxes. But at least one could say, if inaccurately, that the reason for the disparities was that the poorer districts were not trying hard enough. Prudently, from a political standpoint, Missouri never made an effort to rob the rich school districts to give to the poor ones—a disaster in states that tried it.[34] Nor did the state ever try to limit the ability of rich districts to raise more money through their property taxes over and above what is provided in the state's formula.

Within about 10 years, legislators determined that the 1993 formula was in need of revision. The amount of state money required each year to keep full funding of the 1993 formula continued to grow, in part because the formula gave local districts an incentive—in the form of more state aid—to raise their property tax rates, and most districts did.

## Changing the Subject

Because equity could not be achieved in school funding, perhaps it was best to change the subject when revising the formula. In the years since the 1993 school funding revision, the question of "adequacy" has become increasingly the focus of school finance litigation around the country.[35] In Missouri, the 2005 school funding legislation accordingly changed the subject

32. *Id.* at 2062.

33. Many wealthier districts received little or no money from the state under the 1993 formula because of the high yield of property tax revenues, and these districts were "held harmless" to receive the same state aid as they did under the pre 1993 state formula.

34. *See* RYAN & HEISE, *supra* note 23, at 2060 (noting that "in places like Texas, Kansas, and Vermont, recapture plans—dubbed 'Robin Hood' schemes—have provoked continued and intense political squabbling, public protests, and litigation.").

35. RYAN & HEISE, *supra* note 23, at 2059.

from the 1993 concern about disparities and access to resources to "adequacy" of resources.

This change of subject is supported in part by the observation that school districts with a great deal of money often do not produce the best results. The new law recognizes that a certain level of funding is needed for the district to provide an "adequate" education.[36] The formula arrives at an "adequacy" amount—initially $6,117 per pupil—by ascertaining a number of districts that are performing well and averaging their per-pupil spending.[37]

What a school district has available to spend beyond the "adequate" threshold, of course, is influenced largely by its property tax wealth. So the question of disparity is supposedly of less concern because the new formula will assure that all students have what the legislature has determined is adequate. There is a catch, however, because the $6,117 legislatively determined to be "adequate" only counts a district's operating costs, which by law include no spending for debt service or other capital needs. When it comes to spending adequacy-based local and state revenues, however, districts may spend up to 12 percent of these revenues for debt service and capital purposes.[38] This means that districts that depend on the state funding formula (that is, they are not held harmless because of their per-pupil property wealth) always will be spending less for operating costs than the adequacy-based formula provides. The formula, therefore, always will be funded inadequately for operating costs when districts use some of their adequacy-based revenues for debt service and capital purposes. That is true for most of the state's 500–plus school districts. Property-rich districts, by contrast, will not have to devote limited operating revenues to debt service and capital purposes as do property-poor districts, so their "adequacy" amounts will be greater than other districts' adequacy amounts. Perhaps this inequity—and inadequacy—of "adequacy" was unintended, or perhaps the legislature deemed a difference of up to 12 percent to be close enough for government work.[39]

36. Today's contest between the state and these plaintiffs about "adequacy" is a great improvement over where we were just 30 years ago, when, for example, in the Kansas City school desegregation case, schools for black students were found to have received hand-me-down books from the schools for whites as recently as the late 1970s. *Jenkins v. Missouri*, 639 F.Supp. 19 (W.D.Mo.1985); 807 F.2d 657 (8th Cir.1986). The *Jenkins* litigation produced 75 published opinions and orders, including two decisions of the United States Supreme Court, *Missouri v. Jenkins*, 495 U.S. 33, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990) (*Jenkins*) and 515 U.S. 70, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (*Jenkins II*). *See also* Alison D. Morantz, "Money and Choice in Kansas City: Major Investments with Modest Returns," *in* DISMANTLING DESEGREGATION 241–43 (GARY ORFIELD & SUSAN E. EATON eds., 1996).

37. The adequacy amount is determined by taking the operating costs in the districts that perform well on the state's performance standards, excluding five percent of the pupils in the highest and the lowest spending districts, and then calculating the per-pupil spending. Section 163.011(18), RSMo Supp.2008.

38. The 12 percent difference is derived as follows: Under section 163.043, RSMo Supp. 2008, five percent of the adequacy amount, which comes from the classroom trust fund provided mostly by gaming revenue, can be used for any purpose, including capital. Under section 165.011.4(5)(b), RSMo Supp. 2008, up to seven percent of the adequacy amount can be shifted from operating expenses to capital purposes.

39. The phrase "close enough for government work" entered the modern Missouri judicial vocabulary through a dissent by my predecessor, Judge Edward D. Robertson, Jr., in *Associated Indus. of Missouri v. Director of Revenue*, 857 S.W.2d 182, 195 (Mo. banc 1993).

The constitutional language is in some parts poetic and in some parts specific. As to the poetic, the school districts and other plaintiffs suing the state have a difficult chore in making a constitutional funding standard out of article IX, section 1(a) of the Missouri Constitution language: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people...."[40] On this point I agree with the principal opinion.

As to the specific, the constitution mandates that the state allocate no less than 25 percent of its revenue to school funding. Mo. Const. art. IX, sec. 3(b). While it might have been helpful if the constitution were to give a definition of the state's "revenue," state courts have accepted the legislature's notion that "revenue" includes only those taxes and other receipts from state sources in the Missouri budget, ignoring, of course, the billions of dollars in "revenue" received from the federal government that also is appropriated in the state's budget.[41] The choice of using only state revenue is defensible because "revenue" includes only the revenues over which the legislature has complete control. By this definition, the money allocated by the General Assembly for schools exceeds the 25 percent requirement.

## A Constitutionally Flawed Foundation

The principal opinion adopts a narrow view of the constitutional language. Unless the constitutional language is specific, there is nothing there to enforce.

Fair enough. But there is specific constitutional language about equalization of property tax rates. Mo. Const. art. X, sec. 14.[42]

The 2005 law builds the school funding system on a flawed foundation that operates contrary to the constitution and to the laws under which property tax assessments are to be equalized. More specifically, the 2005 school funding law adopts the 2004 valuations and freezes them until 2013. Section 163.031.4, RSMo Supp.2008.

What difference does this make?

If a county's assessed valuations are below the legal requirement, a school district in the county would receive more state aid than it otherwise would be entitled to receive. There may be a problem granting standing to taxpayers and schoolchildren in other counties—with fairly correct assessments—thereby permitting them to

The phrase was quoted in the United States Supreme Court opinion in the same case, 511 U.S. 641, 646, 114 S.Ct. 1815, 128 L.Ed.2d 639 (1994).

40. The provision reads in full:
A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the general assembly shall establish and maintain free public schools for the gratuitous instruction of all persons in this state within ages not in excess of twenty-one years as prescribed by law.
Mo. Const. art. IX, sec. 1(a).

41. In *Comm. for Educ. Equal.*, 967 S.W.2d 62, this Court held that funds the state receives from the federal government are not "state revenue" within the meaning of article IX, section 3(b).

42. Mo. Const. art. X, sec. 14 provides:
The general assembly shall establish a commission, to be appointed by the governor by and with the advice and consent of the senate, *to equalize assessments as between counties* and, under such rules as may be prescribed by law, to hear appeals from local boards in individual cases and, upon such appeal, to correct any assessment which is shown to be unlawful, unfair, arbitrary or capricious. Such commission shall perform all other duties prescribed by law. (Emphasis added).

complain that other districts are getting more than their fair share of state dollars.

The Court should focus instead on school districts in counties that have deficient assessments. What if a local school district aspires to be more than "adequate?" If the district with unlawfully low assessments wants to raise its tax rate to yield funds beyond the "adequate" level, the tax rate will not produce the property tax revenues that it should, and the children of the district will get less than they would otherwise be entitled to. The districts, their taxpayers and their children surely have standing to raise this point.

Of course, if valuations are low, the district's voters could approve higher rates to compensate for the low property valuations. But this assumes that the property valuations in a county are *uniformly* low, which they may not be. For instance, a property owner might acknowledge that property valuations are low in his or her county, but the property owner would be reluctant to say that his or her own property is undervalued for tax purposes. The argument that voters can raise the rates to compensate for low valuations also assumes that voters are informed sufficiently to understand the relationship between tax rates and valuations. In a world where, typically, a minority of households in a district have children in the schools, that would be expecting a district's voters also to be particularly generous and communitarian. But even assuming that the district's voters were unusually generous with their own tax money, the constitution places limits on their ambitions.[43] In other words, the property tax system is especially rigged against school districts in counties where the valuations are not assessed properly. Moreover, there are school districts that never may get even to "adequacy"—those whose voters will not approve a tax rate of $3.43—which is the amount section 163.011 sets as the "performance levy" needed to qualify for funding to the "adequacy" level.[44]

School district plaintiffs have a further point that should be addressed: Even if the assessments eventually are equalized as required by the constitution and statutes,[45] the 2005 education law freezes the levels at the 2004 level for purposes of state funding. Even if the state tax commission corrects the constitutional and statutory defects, the defects will continue to deny various districts and schoolchildren of the revenues they should receive because state funding is dependent on the 2004 assessments, not on current valuations.

Section 163.031, RSMo Supp.2008, sets forth the calculation for determining the

---

**43.** Missouri's constitution places a limit on the amount voters in a particular district can increase taxes for the benefit of local schools. Art. X, sec. 11(c) provides:

In all municipalities, counties and school districts the rates of taxation as herein limited may be increased for their respective purposes when the rate and purpose of the increase are submitted to a vote and two-thirds of the qualified electors voting thereon shall vote therefor; provided in school districts the rate of taxation as herein limited may be increased for school purposes so that the total levy *shall not exceed six dollars on the hundred dollars assessed valuation,* except as herein provided, when the rate and the purpose of the increase are submitted to a vote and a majority of the qualified electors voting thereon shall vote therefore"

(Emphasis added).

**44.** Section 163.011, RSMo Supp.2008. This seems at odds with the constitutional provision that authorizes a school district "formed of cities and towns" to impose a rate of $2.75 without a vote of the people; beyond $2.75, a vote of approval is needed. MO. CONST. art. X, sec. 11(b).

**45.** MO. CONST. art. X, sec. 14; section 138.010 et seq., RSMo Supp. 2008.

amount of funding each district will receive from the state. A district's "local effort"—the amount of school funding the district receives from property taxes—is deducted from the amount of state aid.[46] For purposes of the state funding formula, the amount of such local funding is determined based on property tax assessments from 2004–2005. Section 163.011(10)(a), RSMo Supp.2008.

There are, unquestionably, substantial disparities in the way individual counties assess property tax under the state's current property tax assessment system. According to the state tax commission, the assessed valuation of property for property tax purposes should be not less than 95 percent of its market value.[47] In many counties, however, property assessment data reveal that property tax valuations fall significantly below the 95 percent level. One major reason for the discrepancy in market value as compared to assessed valuation is that, in certain counties, assessments are based on a property's appraisal value as reported by the county assessor, rather than on the "true," or market, value of the property based on comparable sales. In counties that base tax assessments on appraisal rather than market or sales value, the reliability of property tax assessment data depends on the accuracy of the appraisal values reported by the individual county assessors. Due to the lack of uniformity in the assessment system, the assessed valuation of property in certain counties is disproportionately low. The 2004–2005 property tax assessment data reflect these disproportionate assessment values.

Because section 163.011(10)(a) bases the proportion of school funding a county receives from "local effort" on the 2004–2005 property tax assessment data, the inequities of the current property tax assessment system affect the amount of school funding each school district receives from the state. The result under the current school funding formula is that school districts in counties with more accurate assessments receive less state funding for public schools. Put another way, counties where property assessments fall well below market value are rewarded with increased state funding for schools.

### Appraisals v. Sales

Article X, section 14 of the Missouri Constitution, which mandates creation of a

---

**46.** Section 163.011(10)(a), RSMo Supp.2008 provides:

> For the fiscal year 2007 calculation, 'local effort' shall be computed as the equalized assessed valuation of the property of a school district in calendar year 2004 divided by one hundred and multiplied by the performance levy less the percentage retained by the county assessor and collector plus one hundred percent of the amount received in fiscal year 2005 for school purposes from intangible taxes, fines, escheats, payments in lieu of taxes and receipts from state-assessed railroad and utility tax, one hundred percent of the amount received for school purposes pursuant to the merchants' and manufacturers' taxes under sections 150.010 to 150.370, RSMo, one hundred percent of the amounts received for school purposes from federal properties under sections 12.070 and 12.080, RSMo, except when such amounts are used in the calculation of federal impact aid pursuant to P.L. 81–874, fifty percent of Proposition C revenues received for school purposes from the school district trust fund under section 163.087, and one hundred percent of any local earnings or income taxes received by the district for school purposes.

**47.** Section 138.390, RSMo Supp.2008, requires the state tax commission to equalize property valuations by adding or subtracting from the incorrectly assessed valuation an amount necessary for the property valuation to reflect its "true" or market value. According to the state tax commission, property is reflective of true value if its assessed value is at least 95 percent of its market value.

commission "to equalize assessments as between counties," is intended to prevent the kind of disparity that the current property tax assessment system and, by extension, the school funding formula, creates. Section 138.390, RSMo Supp.2008, describes the manner in which the state tax commission must equalize the assessment values. If the tax commission believes that the assessed valuation of a certain class of property in a county is "below its *real value* in money," section 138.390.2(1) directs the commission to equalize the assessed valuation of the class by adding "such amount or percent as will increase the same in each case to its *true value.*" (Emphasis added).

With its express requirement that the commission use the "real value in money," the law states that the commission must base its equalization on the market value of a particular class of property. Rather than equalizing the 2004–2005 assessments based on market value based on comparable sales, however, the state tax commission used appraisal ratios to equalize assessments between counties. An appraisal ratio compares the assessed valuation of a home to the *assessed* valuation of a comparable property, rather than to the market or sales price of a comparable property. Because the tax commission's adjusted property assessments among counties is based on appraisal rather than market values based on sales data, the 2004–2005 property tax assessment valuations are not truly equalized as required by article X, section 14 of the Missouri Constitution. As such, it is constitutionally impermissible

for the state to rely on these values in allocating state funding for public schools.

By disproportionately taxing some Missourians but not others, the current property tax assessment system also violates the constitutional requirement that taxes "be uniform upon the same class or subclass of subjects within the territorial limits of the authority levying the tax." Mo. CONST. art. X, sec. 3.[48] A school funding system based on unconstitutionally disparate taxation cannot be upheld. *State ex rel. Sch. Dist. of City of Independence v. Jones,* 653 S.W.2d 178 (Mo. banc 1983).

That the current funding formula is time-limited does not lessen the need to remedy its unlawful unfairness. The formula locks in the 2004–2005 assessments as the basis for determining the amount of state aid a county will receive until 2013. This is not a case of making the best of a bad situation; it is perpetuating a bad situation. Many of the children disparately impacted by the funding formula will have graduated by 2013; locking in the formula's inequalities for so long is constitutionally unacceptable.

### Who Benefits?

One may ask why these valuations are locked in for so long. Perhaps the explanation may be found by answering the age-old question: Who benefits? Are they mostly the fast-growing suburbs? School districts in rapidly growing areas of the state would seem to do well because they would continue to get state aid based on their 2004 valuations even though newly built properties are coming onto the tax

**48.** Art. X, sec. 3 of the Missouri Constitution provides:

Taxes may be levied and collected for public purposes only, and shall be uniform upon the same class or subclass of subjects within the territorial limits of the authority levying the tax. All taxes shall be levied and collected by general laws and shall be payable during the fiscal or calendar year in which the property is assessed. Except as otherwise provided in this constitution, the methods of determining the value of property for taxation shall be fixed by law.

rolls and producing local revenue without having that revenue deducted from their state aid entitlements. Are the losers, relatively speaking, the slow-growing or declining areas that are mostly rural school districts?

These are questions to be answered in the legislative process, not in the courts. If school finance legislation follows the golden rule of "he who has the gold makes the rules," it is of little or no concern to the courts.

But the rules—regardless of the gold of those who make them-must conform to constitutional requirements. That *is* the courts' concern. It is not my purpose to revive old resentments that pit urban or suburban areas against rural interests but simply to point out that when the system is rigged unconstitutionally, the losers should have a judicial remedy.

This is not the first time this Court has been called upon to evaluate the state's property tax system for funding public schools. In *Jones,* this Court considered the equalized assessed valuation system employed under the state's school funding formula. The Court held that equalization of a district's assessments required that

the state consider real and tangible personal property separately in determining the true value of property in a district. 653 S.W.2d at 191. The Court in *Jones* also noted the long history of judicial review of the state's school funding procedures, explaining that "similar statutory procedures for apportioning state school funds have been in effect for more than 100 years during which time numerous legal challenges to school fund apportionments have been instigated by school districts and determined on the merits." *Id.* at 187.[49]

*Jones,* decided only 26 years ago, may be a relic of an era when this Court played its proper role in our system of checks and balances. I hope it is not a relic. I recognize that plaintiffs in this case abandoned a direct attack on the question of equalization of the assessments. Though I make the argument that this Court should address the equalization issue in evaluating the constitutional validity of the school finance law, as the Coalition to Fund Excellent Schools urges, I read today's principal opinion as keeping the door open to a direct challenge to the state's failure to equalize property assessments properly.

**49.** The Court in *Jones* cites the following cases in which this Court reviewed the state's school funding mechanism: *State ex rel. School District of Kansas City v. Young,* 519 S.W.2d 328 (Mo.App.1975) (mandamus compelling state board of education to exclude property in newly annexed area when calculating the assessed valuation of relator school district); *State ex rel. School District of Pattonville v. Lee,* 83 S.W.2d 87 (Mo. banc 1935); *State ex rel. School District of Kansas City v. Lee,* 66 S.W.2d 524 (Mo. banc 1933); *State ex rel. School District of Kansas City v. Lee,* 66 S.W.2d 523 (Mo. banc 1933); and *State ex rel. School District of Kansas City v. Lee,* 334 Mo. 513, 66 S.W.2d 521 (Mo. banc 1933) (mandamus compelling state superintendent of schools to set moneys aside for special purposes before apportioning state school funds); *State ex rel. Robertson v. Lee,* 315 Mo. 817, 287 S.W. 37 (Mo. banc 1926) (mandamus compelling distribution to school district of additional state school funds); *State ex rel. Consolidated School District No. 9 v. Lee,* 303 Mo. 641, 262 S.W. 344 (Mo. banc 1924) (mandamus compelling the state superintendent of schools to correct a mistake previously made in apportionment of state school funds); *State ex rel. Consolidated School District No. 1 v. Hackmann,* 302 Mo. 558, 258 S.W. 1011 (Mo. banc 1924) (mandamus compelling state auditor to draw warrants upon state treasurer for amounts due in payment of school aid the preceding year); *State ex rel. School Directors of District 117 v. School Directors of District 15,* 90 Mo. 395, 2 S.W. 420 (Mo.1886) (mandamus by school district compelling neighboring school district to pay $93 in allegedly misdirected state school funds).

I agree with the principal opinion that the Court should look to specific provisions of the constitution. Article X, section 14 explicitly mandates creation of a commission "to equalize assessments as between counties." Pursuant to this constitutional mandate, section 138.010 et seq., RSMo Supp.2008, establish and set forth rules of operation for county boards of equalization. The requirement of using equalized assessed valuations is specific. It requires no interpretation but simply is to be applied. Because the state's school funding formula is built upon a foundation that violates article X, section 14 of the state constitution, I believe the state school funding formula presently before the Court is unconstitutional. The Court should require the General Assembly to use another basis for funding Missouri's schools if the present property tax structure is not brought up to constitutional standards and unlocked to allow distribution of state funds to be affected by equalized valuations, not unequal valuations that are locked in for eight years.

### Why Does This Constitutional Defect Matter?

The property tax-based system, as noted, confines many local districts to an amount that the law has deemed to be adequate and, as a practical or legal matter, does not allow for a district to get more money than the adequacy amount. If you, the reader, have read every word of this opinion so far, struggling through the tedious parts and enjoying the wit and wisdom of the rest, chances are you have spent countless hours educating yourself beyond the minimum that schooling has had to offer.

After all, our schools are still following the 19th century agricultural calendar that allows the children to be available to toil in the fields during the growing season. Schooling occurs in fewer than half the days in a calendar year. The school day itself begins around 8 a.m., when many adolescent brains are not fully awake, and extends to mid-afternoon. This allows ample time for participation in sports or other extra-curricular activities or—in the absence of parental or other adult supervision or perhaps in spite of it—for channel-surfing, Internet-surfing, criminal mischief or sex. Extracurricular time may be productive and may count as socialization, but one would be hard-pressed to find more than a few hours of each school day devoted to time on task for mastery of academic subjects or vocational skills needed for a productive life.[50] This is not exactly the

---

**50.** Educational success is based a great deal on how much time on task there is. In MALCOLM GLADWELL, OUTLIERS THE STORY OF SUCCESS 259–60 (2008), the author discusses a study of Baltimore public school children titled *Schools, Achievement and Inequality: A Seasonal Perspective*, by Karl L. Alexander et al., in 23 EDUC. EVALUATION & POL'Y ANALYSIS 171 (2001), and concludes:

> The only problem with school, for the kids who aren't achieving, is that there isn't enough of it. [The author of the study] has done a very simple calculation to demonstrate what would happen if the children of Baltimore went to school year-round. The answer is that poor kids and wealthy kids would, by the end of elementary school, be

doing math and reading at almost the same level.

    .... The school year in the United States is, on average, 180 days long. The South Korean school year is 220 days long. The Japanese school year is 243 days long.

One of the questions asked of test takers on a recent math test given to students around the world was how many of the algebra, calculus, and geometry questions covered subject matter they had previously learned in class. For Japanese twelfth graders, the answer was 92 percent. That's the value of going to school 243 days a year. You have time to learn everything that needs to be learned—and you have less time to unlearn it. For American twelfth graders, the comparable figure was 54 per-

kind of education designed to prepare our children for competition in the global marketplace.

What would a school district need to engage its pupils and students in full days of learning and useful activity in a school year that stretches through the growing season? Money. The amount of money currently available to many districts may be "adequate" only to ensure mediocrity. Having more money, of course, does not ensure that a school district will produce a world-class education. But not having enough money nearly always dooms a district to mediocrity.

Legislators are in charge of the funding system; they can congratulate themselves when the funding for schools exceeds funding provided in the past. But the fact that past funding may have been inadequate is no guide to what is needed now and in the future. It is little comfort to those who seek education for their children to be assured that the resources available are adequate according to 20th century standards. The real question is whether the resources will be adequate for our children to receive an education that will help make

them competitive in a world marketplace in the 21st century.

The United States in the past has made up for some of its deficits in education by allowing immigration of highly educated persons from other countries to fill gaps in our needs for scientific, medical and other specialized professionals. This has allowed the country to stay at or near the top of scientific achievement for many decades. This attention to the top perhaps has distracted from the need to develop a maximally educated and trained human workforce in all sectors of society. States compete with each other and with other countries in attracting companies with jobs by offering tax breaks and other "economic development" incentives with scant attention to the attractiveness of a well-educated workforce. The nature of such global competition increases the anxiety that many in this country feel that their own children will not achieve the same standard of living that they have had. One of our country's great attributes is that it is easy—relative to much of the rest of the world—to be well off. But often overlooked is how difficult it is to be poor in America.[51] Education is the difference for most of us who did not inherit wealth.

---

cent. For its poorest students, America doesn't have a school problem. It has a summer vacation problem....

**51.** The difficulties of living in a society with great disparities in the distribution of wealth are well known and, one suspects, well accepted. Also well accepted is the link between financial well being and educational outcomes. What are not well appreciated are the deleterious effects experienced by those who are not poor but live in states with great inequalities of income distribution. In a nationwide study, it was reported that "those in the middle income groups in states with the greatest inequalities in income rated themselves as having poorer health than those in middle income groups in states with the smallest inequalities." Bruce P. Kennedy et al., *Income distribution, socioeconomic status, and self-rated health in the United States:*

*multilevel analysis,* 317 BRITISH MED J. 917 (Oct. 1998). *See also* Michael Wolfson et al., *Relation between income inequality and mortality: empirical demonstration,* 319 BRITISH MED. J. 953 (Oct. 1999) ("Evidence is accumulating that living in a society with higher inequality in income predisposes its members to higher mortality; at the same time, there is widespread evidence that, for individuals, higher income is protective."). In a 20 year study of the relation between household income and risk of death in the United States, the negative effects of low income are partially offset by educational attainment. MICHAEL MARMOT, THE STATUS SYNDROME: HOW SOCIAL STANDING AFFECTS OUR HEALTH AND LONGEVITY 17 (2004).

Schools ideally are helpmates to parents in the education of children. But they have taken on greater roles as the demographics of families have changed with increases in single-parent households and households where both parents work outside the home. Many children have opportunities for educational enrichment that are available outside of schools. For others, schools are the only chance. The resources that the General Assembly can command make the difference. Thus far, I fear, we and our legislators have failed to do the right thing for many of our state's children.

We can believe that all our children are above average. Belief is a powerful part of encouraging children to succeed. But belief, without sufficient resources, is not enough.[52]

### Conclusion

The General Assembly's revision of the school funding formula was accompanied by expressions of the best of intentions in improving the education of the state's schoolchildren by establishing a standard of adequacy. The Court's role is not to join the applause by brushing lightly over some serious-sounding but shop-worn constitutional doctrines and pronouncing the legislative efforts good enough. The Court's role, rather, is to judge the constitutional validity of what the legislature has done, not what it has said. As a citizen I

do applaud the General Assembly's attempt to express adequacy in monetary terms. As a judge, on the other hand, the 2005 law's constitutional flaw causes me to conclude that the work of the General Assembly regarding adequacy of funding is constitutionally inadequate. My applause, as a result, is the sound of one hand clapping.

The 2005 law ensures that a majority of the state's students will receive an inadequately funded education based on the General Assembly's own definition of adequate funding.

Moreover, if there are districts that want to go beyond adequacy, they will not be able to do so. If there is an upside to our system of local districts, surely it must be that individual school districts can aspire to fund something better than adequacy. But the system is rigged so that the best that some districts can get is funding the legislature says is good enough. For some districts, the 2005 law will not provide adequacy, only delusions of adequacy.

While there is not a direct relation between a school district's money and its performance, money is not irrelevant. Good educational outcomes are achieved in districts with modest resources. But money is needed to buy the academic leadership, the teaching staff, the time on task for mastery of basic subjects and other resources needed for educational enrich-

---

**52.** I attended grade schools and a high school with remarkably modest resources, but they were, in effect, heavily subsidized by their staffs of nuns who had taken a vow of poverty and, to a lesser extent, were subsidized by non-cleric teachers who made financial sacrifices to teach in religious schools. I came to appreciate in retrospect that these parochial schools also were aided immensely by a belief system that I would re-state as follows: Every child has a soul worth saving, and to save his or her soul we must make the child a productive member of society.

In recent decades, secular schools have sought belief systems that might have similar power, such as "all children can learn," and "no child should be left behind," though the latter phrase has been battered by controversy that may have diminished its power.

In today's public schools, the education is subsidized by the best teachers who are underpaid relative to their talents and worth to society—not as great a subsidy as my teachers with a vow of poverty, but a subsidy nonetheless.

ment that can produce optimal outcomes. Plainly and simply, the money needed is beyond the reach of many Missouri school districts.

The racecourse for some districts and their children is uphill; for others it is downhill. To the extent that this situation is the product of constitutional violations, it calls for judicial remedies. Courts cannot solve the deficiencies in our public schools, nor can courts produce the money school districts need. But courts should not perpetuate the harm that may be done by failing in its role of enforcing specific constitutional provisions.

Fixing the piece of this property-tax-based system that has a specific constitutional problem may address only a relatively small part of the resource deprivations that many public schools suffer. But court decisions about particular legal points such as the one presented here—but not decided—sometimes break the inertia that sets in, spurring changes in the policy-making branches of government.[53] This case calls on the Court to choose whether to be an enabler of the General Assembly's disregard of constitutional standards. The Court today has not made the right choice. Perhaps some day it will.

---

**53.** With or without court decisions, perhaps the policy-making branches of government, with the encouragement of their constituents, will rethink the method and amounts of funding public education. Or, perhaps the people, either through the referendum or initiative process, will revisit the constitution's 25 percent of state revenue adequacy standard in Article IX, section 3(b). The people first adopted the standard in the Constitution of 1875, and it was included in the Constitution of 1945 which is in effect today. The state's educational needs obviously are different today than in 1875 and 1945. But these needs—for the resources and for the restructuring that are needed to make all schools capable of providing graduates who can compete in the 21st century—can be met by the policy branches of government without changing the constitution.